# CHARLESTON.

## STATE *v.* HENRY.

Submitted January 31, 1902.    Decided March 29, 1902.

51 283
52 164

51 283
59 24

51    283
f82    131
62    573

1. CRIMINAL LAW—*Murder—Evidence.*

    In the trial of an indictment for murder all instruments which the evidence tends to show were used in the perpetration of the crime, may be produced for the inspection of the jury. (p. 292).

2. EVIDENCE—*Criminal Trial—Blood Spots.*

    When the evidence shows that the coat worn by the accused, when with the deceased just before the killing, was found hidden in the prisoner's room between the mattress and slats of his bed, and there are spots on it which might have been made by the blood of the deceased, and on other clothing of his worn at the same time similar spots are found, and the mode of the killing was such as makes it probable that the blood of the victim did spatter upon the clothing of the murderer, such clothing may be produced at the trial for the inspection of the jury, and a witness who saw the spots soon after the murder may testify that he supposed the spots were blood stains, as the statement is nothing more than his opinion, and that is all he could state with certainty. (p. 292).

3. MURDER—*Evidence—Instruments Used.*

    It is not error to allow the jury to inspect instruments used in the commission of the crime and the clothes of the prisoner, bearing marks which the evidence shows may be blood stains, and to hear non-expert testimony as to the character of the marks, without it having been established by microscopic examination or otherwise that the marks are blood stains. (pp. 297, 298).

4. CRIME—*Motive—Evidence—Pay Checks.*

    When the motive for the crime appears to have been robbery and there is evidence tending to show that the prisoner was practically without money just before the murder and had considerable money immediately afterwards, but claims that it was his own, it is proper to ask him on cross-examination if he did not, shortly before the murder, deposit for drinks at a saloon, pay-checks representing wages due him. (p. 298).

5. MURDER—*Instruction as to Blood Stains.*

    It is not error to refuse to instruct the jury that they are not permitted to say blood found on the clothes of the accused, is human blood, in the absence of the establishment of that fact by a microscopic examination. (p. 299).

6.  CRIMINAL TRIAL—*View of the Premises.*

    When a view of the premises is taken the court is not bound to instruct the jury that they should not consider as evidence any of the objects or locations pointed out to them upon the grounds.   (p. 300).

7.  CRIMINAL TRIAL—*Ruling of Court—Exceptions.*

    Errors in the rulings of the court, made during the trial, and as to other matters not vital and jurisdictional in their nature, but such as may be waived, must be affirmatively shown by the record, else the proceedings are conclusively presumed to be regular.   (p. 300).

8.  JURY TRIAL—*Murder Verdict.*

    The following verdict is sufficient:   "We, the jury, find the defendant, S. H., guilty of murder in the first degree as charged in the within indictment."   (p. 300).

9.  CRIMINAL TRIAL—*Verdict—Motion to Set Aside.*

    When, upon a writ of error to a judgment in a criminal case, overruling a motion to set aside a verdict and award a new trial on the ground that the verdict is contrary to the evidence, the evidence, not the facts, is certified in the bill of exceptions, this Court will not reverse the judgment, unless, after rejecting all the conflicting oral evidence of the exceptor, and giving full faith and credit to that of the adverse party, the decision of the trial court still appears to be wrong.   (p. 301).

Error to Circuit Court, Wetzel County.

State Henry was convicted of murder in the first degree, and brings error.

*Affirmed.*

McINTIRE & McINTIRE and R. R. FAUNTLEROY, for plaintiff in error.

E. L. ROBINSON and R. H. FREER, Atty. Gen., for the State.

POFFENBARGER, JUDGE:

This is a writ of error to a judgment of the circuit court of Wetzel County, granted upon the petition of State Henry, a colored man, who has been convicted of murder in the first degree and sentenced to be hanged for the murder of one John Richardson, who was also colored.   They had come to Wetzel County from North Carolina in March, 1900, to work for a construction company engaged in building the West Virginia Short Line Railroad.   At that point, and at the time of the murder,

there were more than one hundred colored men working for said company. The railroad ran along Fishing Creek, and at the point where these men were working the creek made a sharp bend around the point of a hill and opposite this hill there was another. The line of the railroad cut off this bend, crossing the creek at two places, and ran through both hills, making a tunnel on each side of the creek, called in the evidence in this case the "Twin Tunnells." Some distance below this bend, the railroad crosses the creek again just above a little village called Porter's Falls. Between the point at which the railroad crosses the creek between the two tunnels and the point at which it crosses just above Porter's Falls, the creek runs between the railroad and the public road. The construction company's commissary, where the men were paid off and bought their supplies, was a short distance below where the railroad crosses the creek between the tunnels and a short distance below that there was a saloon. From the saloon and commissary, the two points most frequented by all the employes, Porter's Falls could be reached either by going down the public road on the same side of the creek or by going a very short distance up the creek, crossing it on the railroad, passing through the tunnel and following the railroad on the other side of the creek down to Porter's Falls. The distance was about the same by the two routes. Between the commissary and the railroad crossing between the tunnels there was a small shanty occupied by a negro whose name was Ison, and another occupied by Willie Wilson, and the company's engine house. All these laborers occupied small temporary buildings called shacks or shanties, situated at various places in the neighborhood of these two tunnels. The defendant's shack was beyond the creek and the tunnel, a short distance from the commissary and near the railroad. It had a partition through it and one end of it was occupied by the defendant and possibly another man or two, and the other end by John Richardson and a man named Phillips. Just across a small branch called State Road Run stood another shack which was occupied by Jerry McCissom, Harris Hunter and Calvin Parks and probably others. It was the custom of the construction company to pay the men on the 20th of each month. In the month of October, 1900, the 20th occurred on Saturday, and as this murder occurred within a very short distance from the commissary, at which the deceased drew

his month's pay, and within less than an hour after he got his money, and several of the parties whose names have been mentioned went to the commissary with him and left there with him, it becomes necessary to trace minutely their movements during that evening. The defendant, John Richardson, Calvin Parks, Harris Hunter and Jerry McCissom all quit work at the same time, shortly before 6 o'clock, and went to the commissary together and drew their money in pay envelopes. Before this occurred it was understood among them that they were all to go to Porter's Falls after receiving their wages. Having gotten their money they all came out of the commissary and started down the road to the saloon, some four or five hundred yards distant and in the direction of Porter's Falls. When at a point about half way to the saloon or more, Henry and Richardson stopped, they being ahead of the others, and some of the others asked, in some form, why they had stopped, and the defendant said he had some apples across the creek or by the creek on the same side, there being controversy as to the locality indicated, and he and Richardson were going to get the apples, and after doing so they would meet the others at the saloon. Henry had spoken of the apples during the day, saying that he had found them on the day before. As to where he said the apples were there is controversy. They separated at this point, Henry and Richardson going down toward the creek through some brush or woods, and the other men going on to the saloon. Across the creek from this point and some distance from the creek up in the meadow Richardson was found dead in the afternoon of the next day. His skull had been crushed with a stone mason's hammer and he had been dragged by the feet for some distance from the point at which he was killed to a place where the sod had been taken up with a shovel and a hole dug under it and his body had been put in that hole and the sod turned back over him so as to almost completely cover him up. The hammer was found fifty or sixty yards from this grave and the shovel at some point in the field near by. The hammer and shovel belonged to the tools used in the tunnel. The hammer had been missed from the tunnel on Friday. On that day the defendant had not worked but had been down to Porter's Falls and at other places in the neighborhood and at his shack and also had passed through the tunnel. As he walked with Richardson from the commissary on the evening of the day of the

murder he carried under his arm a grain sack, called by some of the witnesses a "croker" sack. He claims he had that sack to put the apples in, he, having on Friday, left the apples somewhere in the brush near the creek in two paper sacks. The defendant, Hunter, Parks and McCissom all agree that Henry was not seen any more by the others until they met an hour or more later at Porter's Falls. There is no doubt that within that time Richardson was killed and the only question in the mind of counsel for the prisoner seems to be whether he took Richardson across the creek and murdered him or whether Richardson left the defendant, overtook the other parties on their road to Porter's Falls by way of the railroad and tunnel and was killed by some of them. The defendant testifies that he and Richardson did not cross the creek but went down near it and got the apples and come back up to the road and then went back up the road together to the commissary. There, Richardson went into the commissary and the defendant went on to Willie Wilson's shack, intending, it seems, to leave the apples there. Finding nobody in there and the door locked, he left the apples on a table outside of the shack. Then coming back to the commissary, as he went in, Richardson came to the door and looking up the road said, "Yonder goes a light. I believe I will go and overtake it, for I think it is John and Harris going the way of the tunnel." Henry says he saw the light and it was just below the engineer's house, but he declined to go with Richardson, saying, "I ain't ready, I ain't got my mail yet," and he says he asked Richardson to go down to the saloon as they had promised the boys to go down there and go to the Falls with them. Richardson said, "No, there goes a light, and I believe that is them now." Henry replied that he would go down to the saloon, and Richardson said he would go on and that he wanted to catch the light. He says Richardson did go in the direction of the tunnel and that he (Henry) went on down to the saloon, and found that none of the other men were there and then he went on down the public road to Porter's Falls. The other men say they went on down to the saloon after Henry and Richardson left them to get the apples and that they remained there for three-quarters of an hour, waiting for Henry and Richardson to return. Then they left the saloon and went back up the road to the commissary where they stopped for five or ten minutes and got some groceries of some sort, thence on up to the

shack occupied by Ison, where they procured a lantern, thence on up to the railroad, thence across the creek and through the tunnel following the road to their shack where they stopped just long enough to put away their groceries, and thence on down the railroad to Porter's Falls. Going into the store of a Mr. Pipes, they found State Henry in there and Pipes testified that he had been there for about twenty minutes. These parties say that when they found Henry in the store some inquiry was made about Richardson and that Henry replied that Richardson had left him saying he was going to the saloon. After they had all transacted such business as they had at Porter's Falls that evening they returned to their shacks by way of the railroad, the defendant coming along with them. When they got up to a point even with Henry's shack and he left them, going rather up a hill, there was something said about the apples. He invited Parks to go up with him but Parks said he did not want to walk up the hill to come back down, and as he started, Parks asked him if he got the apples and told him he would be up early in the morning to get some of them. Henry said something in reply to that but none of the witnesses were able to state what it was. At an early hour next morning, Phillips, who occupied the room with Richardson, hollowed over to the men in the shack across the branch occupied by Parks, McCissom and Hunter, inquiring about Richardson and saying that he had not come home. Then several of them started in search of Richardson. The defendant, at about that time, came out of his room but did not join in the search. He took a small bucket and followed some of these men through the tunnel and around to the commissary to get some lard, as he says, but was unable to do so and then went on down to the saloon. There, he joined Ison, Parks and James Foster in searching for Richardson. He and Ison went down into the woods and looked through them along the creek. After this search he returned to his shanty about 8 or 9 o'clock, he says. There is no evidence of his searching any further. Parks says that Henry overtook them before they reached the commissary and that he had a conversation with him about Richardson and that Henry said he would bet that some one had killed him and that it was Will Taylor and George Johnson, and that they had been around there the night before. He further says that after they had searched through the woods along the creek, he

returned to the saloon and that Henry came up to him and they had another conversation in which Henry said, "It looks to me like I was the last man that seen John Richardson and the way I feel, I feel like I would rather be dead," and says he replied to this and told Henry that the only thing for him to do was to prove where he left Richardson, and then Henry said, "I was the last man seen with him, and I would rather be dead the way I feel over it." It is urged here, as it doubtlessly was before the jury, that the defendant's statement as to how he reached Porter's Falls, and then, when, where and how Richardson left is substantiated by certain testimony. Willie Wilson, a witness for the State, testified on cross-examination that he went to the commissary at about half-past 6 o'clock and that Richardson and Henry were standing in the middle of the floor. He spoke to them and as he turned to the counter to get his money he heard Richardson say to Henry, "Are you ready?" He says he also heard Henry say to Richardson, "You go ahead and catch the light." Again he says he heard Henry say to Richardson, "Go ahead and catch the light and I will catch you." He says that at the time this occurred Harris Hunter and Calvin Parks were in the commissary. At another place he says it was about 6 or half-past 6. Wilson says he went to his shack soon afterwards and then went to the well and got a bucket of water and went back in his shack and was not out any more that night, and he denies that there were any apples left on his table. But it is claimed that the apples are accounted for in the testimony of Calvin Parks and that part of his testimony upon which this claim is based reads as follows: "He (Henry) quit Thursday evening of pay day, Friday he didn't go to work at all. Saturday he was on, and he was shoveling at the grade where I was, and he told the boys that he had some apples hid over there, the best apples that he had since he had been in West Virginia, because they were big white apples of a fellow by the name of Brown said he got them apples that night, and said he was going that night to get them. I thought when he left, that he was going to get the apples." It is contended in the brief that the word "of" before the words "a fellow" should have been written "and" by the stenographer, and that what Parks meant was that Brown had said he had gotten the apples that night, the apples which Henry says he left on Wilson's table. The State relies upon the following facts as strengthening its posi-

tion : John Richardson had drawn twenty-six dollars and seventy cents that evening. State Henry had drawn four dollars and eighty-three cents, or about that. Both together had drawn thirty-one dollars and fifty-three cents or about that. Tending to show that the four dollars and eighty-three cents was all the money Henry had are the facts, that, on Friday he had deposited with Mrs. Morgan seven dollars' worth of pay checks to secure a debt of three dollars and fifty cents which he had owed Mr. Morgan for some time, that Mr. Morgan had asked him for the money, that day, that at some time in the week he had used a pay check at the saloon, that in September he had sent his wife back to North Carolina and had gone to the commissary and gotten them to advance him six dollars, claiming that he did not have money enough to send his wife home and that on the 20th of September he had only drawn thirteen dollars and eighty-five cents On the night of the murder he went to Porter's Falls, as has been stated, where Mrs. Morgan lived and paid her the three dollars and fifty cents and took up the checks. Then he went to Pipes' store and bought a suit of clothes for ten dollars and other goods amounting to one dollar and twenty-five cents and paid for all in cash. Then he handed Cal Parks a ten dollar bill and a five dollar bill, asking him to take care of it. His explanation of this is that there were some strange men at his shack and he was afraid they would rob him or steal his money, it being pay day, by reason of which it was supposed that all the men would have some money. This fifteen dollars was returned to him by Parks at the saloon on the next day, when Henry told him that he felt like he would rather be dead, etc. These items amount to twenty-nine dollars and fifty-five cents and if he deposited a pay check for one dollar at the saloon and took that up, as the evidence tends to show, the whole amount was thirty dollars and fifty-five cents, just about the amount of money that he and John Richardson both drew that evening. Not a cent of money was found on Richardson's body when they took him out of the hole in the ground in the meadow. Henry had selected this suit of clothes sometime before and there is other evidence tending to show that he intended to go back to North Carolina. On Sunday he sent a registered letter to his wife, probably inclosing the fifteen dollars. As against this evidence, he says he had twenty-five dollars which he had

saved up during the time of his service, and would not use it
for any purpose for the reason that he had sent his wife home
in the care of a strange man and he did not know what might
happen to her and he kept this money so that if anything did
happen to her on the way home he could go to her relief and
that he did not hear from her until about October 20. This is.
the reason he assigned for using pay checks at Mrs. Morgans
instead of paying money. He denies saying that he did not
have money enough to send his wife home when he went and got
the six dollars. The coat which Henry had worn on the even-
ing of the day of the murder was found secreted under his bed
between the tick and the slats and it had on it what appeared to
be blood splotches. The overalls he wore that evening were
found somewhere in the shack and there were blood spots on
them. Henry accounts for the appearance of blood on his
coat by saying that, if it was blood, it was from his having
carried some beef from the butcher's wagon to his shack a few
days before the murder. A circumstance relied upon as tending
to show that Jerry McCissom committed the crime, is that Mrs.
Cox, the daughter of Mrs. Long, had seen McCissom at their
house early Sunday morning and that he was so quiet and so
different in his conduct from what was usual on his coming
there to get milk that members of the family commented upon
it after he had gone away. This house stood near the place at
which Richardson's body was found. This is the substance of
all the evidence in the case.

The first assignment of error is that the court did wrong
in overruling a motion to quash the indictment. It is in the
statutory form and sufficient.

The next complaint is that the court erred in permitting the
State to introduce in evidence the hammer found in a field ad-
joining that in which the body was found or near the grave.
The testimony shows that this hammer was found a day or two
after the body was found, that there had been some rain between
the times of the killing and the finding of it and that the ham-
mer, when found, had some hairs on it, and what appeared to be
blood stains. It was also shown that the wounds were such as
might have been inflicted with it. It was so manifestly proper
to allow the jury to take that hammer into consideration that
no time will be given to discussion of the question. No reason
is given for the objection other than that the hammer was not

found just where the body was found nor at the time the body was found. But the apparent blood stains and hair found on it and the nature of the wounds tended to show that it was the instrument with which the killing had been done and it was proper to allow the evidence to go to the jury to have such weight as, in their judgment, it was entitled to.

It is also urged that it was error to permit the witness, John Watts, to point out certain marks or stains on the coat and say, "There were very small splotches; that is I supposed they was blood, they looked to be blood, here is some of the small marks here now." It was shown that this was the defendant's coat, that he had worn it on the evening of the day of the murder; that it was found secreted in his shack and that there were marks upon it which may have been blood stains. "It is the constant practice upon trials for murder to admit evidence of the presence of blood spots upon clothing of the prisoner or the deceased, or at the scene of the tragery. Any witness, expert, or non-expert, may testify that the stains resembled blood. But the point of the objection is that the witness gave it as his opinion that it was blood? Opinion, though not generally admissible, is very frequently so. While the dividing line between what is fact and what is opinion cannot be very clearly defined, a witness, though not an expert, may testify to his conclusion from facts observed, when the matter to which the testimony relates can not be reproduced or described to the jury precisely as it appeared to the witness at the time. In such cases opinions are received in furtherance of justice. It is not practicable to bring into courts walls, floors, or ground stained with blood; not always practicable to produce beds or furniture. And the appearance after a lapse of time is not as it was when fresh after the tragedy to the witness. * * * It is difficult to see, as commonly understood, what was the difference between the witness's saying from mere inspection that a spot was blood and saying that in his opinion it was blood. It was treated as a statement of fact. We say a certain object is a certain thing; that a spot is an oil spot, a paint spot, or ink spot. Is the statement one of fact or opinion under the principles of evidence? Such evidence is admissible. Why not also a statement that a spot is a blood spot, or that it resembled blood, or that, in the opinion of the witness, it is blood?" *State* v. *Welch,* 36 W. Va. 690. This witness was testifying in June, 1901. He had seen

the coat soon after the murder. At that time the spots appeared to him to be blood spots. His testimony as to what he had seen on that coat eight months before and shortly after the murder was corroberated by the marks plainly visible at the time he was testifying. The State was entitled to show what those marks looked like at the time the coat was found and the witness stated it in about the only way in which he could have stated it. Suppose he had said positively that they were blood splotches. That would have eliminated the objection that he was giving his opinion, and it would have been more damaging to the defendant than his saying he supposed they were blood splotches. He only stated in his own way that they had the appearance of blood splotches and that is all that he could say with reasonable certainty. Had the defendant desired to do so he might have cross-examined him as to the size, color and nature of the spots to ascertain whether there was any foundation for his opinion. The reasoning in the opinion in the case of the *State* v. *Welch* is convincing and conclusive on this question.

On cross-examination, Jerry McCissom, a witness, was asked the following question: "Did you have any information that he left Willie Wilson after dark? Going up in that direction?" The witness answered, "No sir, the last recollection that I have, he left him at the commissary, going down towards the saloon." This, the court struck out as improper. The answer is certified by the court in two ways. In the certificate of evidence the witness is quoted as saying "Wilson said he left him at the commissary," etc., but in the bill of exceptions it is as given above. The bill of exceptions was no doubt made up from a transcript of the stenographer's notes, and the words "Wilson said" omitted by mistake. Viewing it so, the evidence was hearsay and improper. Viewing it as correct in the bill of exceptions, striking it out did not tend to support his explanation nor to contradict either McCissom or Wilson for Wilson said he saw Richardson last at the commissary, when Parks and Hunter were there, and all agree that they all started down to the saloon. The question related to when deceased left Wilson. McCissom denied over and over that he had information that Richardson started up the road to catch the light. The statement ruled out does not conflict for it is that he went down the road. However, it is reasonably certain that the language

really used is found in the certificate of evidence and was stricken out because it was improper.

Another objection is to the action of the court in overruling a motion to strike out the evidence relating to blood stains upon the garments and shoes of the defendant, and upon the hammer. In support of this it is claimed that there is no evidence to show that the stains were blood and that if there be sufficient evidence to show that they were from blood there is not sufficient evidence from which the jury could say that it was human blood. "Witnesses not medical men may give their opinion as to whether certain spots were blood-spots. The testimony of the chemist who has analyzed blood, and that of the observer who has merely recognized it, belong to the same legal grade of evidence; and though the one may be entitled to much greater weight than the other, with the jury, the exclusion of either would be illegal." Wills on Cir. Ev. 193. *People* v. *Gonzalez,* 35 N. Y. 49. In *Gaines* v. *Commonwealth,* 14 Wright 319, the following charge given to the jury was held to be correct: "We cannot instruct you that because no analysis had been made of the substance which the witnesses supposed to be blood, no chemical test, no microscopic examination, that you are therefore to reject the evidence as insufficient to show that it was blood. We feel it to be our duty to refer the question to you, and leave it for you to say whether the commonwealth has satisfied you beyond a reasonable doubt that the spots seen by the witnesses were blood." In *Greenfield* v. *People,* 85 N. Y. 75, it was held that a non-expert may testify that spots which he had seen were blood spots. The witness testified that a short time after the commission of the crime he had seen spatters or spots upon stones, and after saying he could testify as a matter of fact what the spots were, he was asked so to state. The court informed him that his opinion was not requested and he would only be allowed to answer as a fact what the substance was. He then answered that it was blood. In the court of appeals, Miller, Judge, said of the competency of this evidence: "In regard to the second ground, we think that the witnesses were competent to testify upon the subject whether the spots described were blood, without deciding the question whether an opinion of the witnesses would have been competent. Under the circumstances, it is sufficient to say that the testimony was only received after the witnesses had shown some knowledge on the

subject as a matter of fact. The question was not whether it was human blood, and no objection was taken on this ground, but what the character of the substance was. It is not difficult to perceive that there are many substances which are commonly known, in regard to which a witness may testify, although he is unacquainted with their ingredients or chemical properties. Many of these would be more familiar to those who had occasion to notice them frequently than to others, and hence they could testify more directly and positively in regard to the same. But to hold that no one but an expert or a scientific person should be allowed to speak on such subjects, would be establishing a stricter rule than is authorized by law. While, then, inexperienced persons and those comparitively ignorant may be able to testify in reference to such substances, the weight to be given to their evidence must of course, depend upon the circumstances and their knowledge of the matter." "Stains of blood found upon the person or clothing of the party accused have always been recognized among the ordinary *indicia* of homicide. The practice of identifying them by circumstantial evidence and by the inspection of witnesses and jurors has the sanction of immemorial usuage in all criminal tribunals. Proof of the character and appearance of the stains by those who saw them has always been regarded by the court as primary and legitimate evidence. * * * The degree of force to which it is entitled may depend upon a variety of circumstances to be considered and weighed by the jury in each particular case; but its competency is too well established to be questioned in a court of justice." Porter, Judge, in *People* v. *Gonzalez,* cited. "So all instruments by which an offense is alleged to have been committed; all clothes of parties concerned, from which inferences may be drawn; all materials in any way part of the *res gestae,* may be produced at the trial of the case." Whar. Law Ev. 312; Bishop Cr. Pr., s. 965; *State* v. *Edwards,* decided at this term. These authorities sufficiently cover all the objections to the evidence relating to the spots on the clothing of the accused and the hammer, and conclusively show that there is absolutely nothing in them. Here, it is to be considered that the only evidence is circumstantial. This coat and overalls had been worn by the prisoner at about the time the murder was committeed. According to the theory of the State, well supported by competent evidence, the accused was the last man

seen with the deceased before he was killed. It was likely from the nature of the wounds and the means by which the killing had been done, that blood was spattered upon the clothing of the murderer, whoever it may have been. This coat was found secreted in the bed of the accused, and, in the absence of any testimony showing that it had been put there by anybody other than the accused, it was competent for the jury to infer that he had secreted it and that there was a reason for hiding it. If there had been no testimony at all from any witness to the effect that the spots upon it appeared to be blood stains, but, as a matter of fact, there were spots upon it which might have been made by the blood of the deceased, it was proper for the jury to examine this coat in connection with the circumstances shown by the evidence, and give the fact of the existence of such spots, such weight as, in their judgment, it was entitled to under all the circumstances shown by the evidence. As time would naturally change the appearance of those spots, it was proper to introduce a witness to show what their appearance had been eight months before. Without assuming that time would naturally change the appearance it would be competent to show by the testimony of witnesses that the appearance had changed, and what it was at the time of the first examination. This is logical, reasonable, and conforms to the general principle of law that the jury may take into consideration every incriminating circumstance shown to have any direct connection with the *corpus delicti*. But it is urged here that the fact that the coat was found where it was, is manufactured evidence. Upon what reason is this asserted? Simply that Jerry McCissom found the coat and he had placed the bloody shovel in the shack of the accused. Was it not for the jury to say who put the coat in there? If it appeared that McCissom had put the shovel in the shack, is that a sufficient reason for holding that he put the coat in there also? That it was, is an argument which it was proper to use with the jury, for it was for them to determine, under all the circumstances, who put the coat in there, and it was not the province of the court to exclude any evidence relating to a matter bearing so directly upon the question of the killing of the deceased. There was evidence from which the jury could infer and find, in the absence of positive and uncontradicted evidence, that some other person put the coat in there, that the accused placed it there. It is admitted

that it was his shack, his bed, his coat and that he had been in there and had had an opportunity to place it there. If, by any means, the finding of a jury upon that separate and distinct question could be brought before this Court for review, it could not be disturbed, under the circumstances, although there might be evidence in the case directly to the contrary of that finding. Aside from the testimony of witnesses as to what the spots were, there was a vast amount of evidence, as has been indicated, tending to show that they were blood spots and that they were the stains of human blood and the blood of John Richardson, the murdered man. The authorities cited and quoted from conclusively show that it is not necessary to the competency of such evidence, that the spots be first shown by expert testimony and chemical analysis to be blood spots. Its competency was the only thing the court had to do with it, its weight was for the jury, and the court was right in permitting it to go to the jury.

Error is also assigned in this case, that the court refused to strike out evidence showing that the shovel was found in defendant's shack, it having afterwards appeared by the evidence of the State's witnesses, that it was used in carrying the body of the deceased to his own shack which was part of the same building and in which the defendant roomed. It is difficult to see how this could have prejudiced the prisoner, for it amounts to the disclosure of the mere history of the shovel. It was found in the field near the dead body, on it the body was carried to the shack, and somebody, possibly McCissom, put it in the prisoner's room, and it was afterwards taken from there and held for use on the trial. Had the State shown this in the order in which it is given here instead of showing, first, that it was found in the field and then in the prisoner's room, it would certainly be unobjectionable. Does it not amount to the same thing, its full history having been given? The explanation was shown by the State by evidence which is as credible as that by which the fact of the shovel having been found in the room was shown. There might be something in the objection had the shovel been the only thing found in the shack which tended to show connection of the prisoner with the crime. Under these circumstances, it must be held if there was error in overruling the motion, it was clearly harmless.

The prisoner was asked on cross-examination if he had not

deposited checks at the saloon for drinks, and it was contended that this was wrong because it was not shown that such deposit was made at a time near the date of the murder. In view of the claim on the part of the prisoner that he had had twenty-five dollars saved from his passed earnings by way of accounting for his expenditures on the night of the murder, it is clearly proper to show the deposit of these checks, as a circumstance tending to show that that claim was false. His reason for refusing to spend any part of the twenty-five dollars went to the jury along with this circumstance, and to the end that the jury might test the truth of his explanation, it was proper for them to consider the deposit of the checks, and give that fact such weight as they thought it was entitled to. It was germane to a question clearly and definitely raised in the case. The deposit was admitted.

A further assignment of error is, that the court permitted the witness, Willie Wilson, to read to the jury a part of a letter which the prisoner had written to his mother, stating what he claimed Wilson had testified on some former occasion, concerning the light which prisoner claims Richardson followed. It was, in substance, what the prisoner said himself concerning that matter. The letter was a request to prisoner's mother to tell Wilson to be sure and write that just as he had written it, saying that was what Wilson had sworn at the trial. At the bottom of it there was a request to Wilson himself to write it in ink and "send it back to me," and signed "Anna Henry, State Henry." Before it was read Wilson testified that it was in the handwriting of State Henry. This may have been competent under the principles laid down in Greenl. Ev. 195*a; People* v. *Marion,* 29 Mich. 31; and *State* v. *Brown,* 76 N. C. 222, as tending to show weakness of the defendant's case in his own estimation, being in the nature of an admission in that sense, but it is unnecessary so to decide, for the court, on objection, refused to allow the letter to be introduced, which amounts virtually to an exclusion of its contents.

The following instruction which the court refused to give at the request of the defendant is the subject of another assignment of error: "The jury is instructed that if they believe from the evidence that blood was found on the clothing of the accused, this fact within itself, is not conclusive that it is human blood, and this fact taken alone, is not conclusive that the

blood so found, is that of a human being. This fact can only be established by a microscopical examination. Science may aid us in determining whether blood is the blood of a human being or that of a lower animal, and without the aid of scientific evidence, it is impossible to say whether the blood found on the clothing of State Henry, is that of a human being or not. You are not permitted to say that the blood so found on the clothing of the defendant is human blood unless this fact be established by proper evidence." Enough has been said in reference to the alleged blood stains on the clothing of the prisoner to show that this instruction was improper and that the court did right in refusing it. To tell the jury that they could not say that the blood found on the clothing of the defendant was human blood unless that fact was established by a microscopic examination, would have been clearly wrong under the principles of law hereinbefore referred to.

The next complaint is that the court erred in permitting the jury to view the scene of the murder, without afterwards instructing them on its own motion that they should not consider as evidence any of the objects or locations pointed out to them upon the grounds. It is proper to say in reference to this that the record does not show that any view was taken, except by some of the questions propounded to the witnesses, nor that the court did or did not instruct the jury. The presumption that the proceedings of the court were regular, when error is not affirmatively shown by bill of exception or otherwise, except as to those things which are held to be essential to a legal conviction, such as indictment, pleading, impaneling of a jury, the oath of the jury, trial by jury, verdict and judgment, is conclusive on the question of the proper allowance of the view. This question is fully discussed in *State* v. *Beatty,* decided at this term of Court. See also *Shrewsbury* v.*Miller,* 10 W. Va. 115; *Richardson* v. *Donahoo,* 16 W. Va. 687, (pt. 14 Syl.) ; *Griffith* v. *Corrothers,* 42 W. Va. 59. View cannot be had except under section 30 of chapter 116 of the Code, which provides that the jury may be taken to view the premises, at the request of either party, but if there was a view it is conclusively presumed here, in the absence of anything appearing in the record to the contrary, that either the State or the prisoner requested it. As to the duty of the court to instruct the jury upon its own motion that they should not take into consideration as evidence any-

thing they saw while at the premises, the same rule applies, for it is presumed that if it was the duty of the court to give such instruction, that duty was performed. This is the position taken by this Court in the case of the *State* v. *Beatty* in reference to the question, whether it is the duty of the court, upon its own motion, to instruct the jury in a trial on an indictment for murder that, if they find the defendant guilty of murder in the first degree, they may recommend imprisonment. It is further held in that case that the court is not bound to give such instruction upon its own motion, for the right to such instruction does not belong to that class of rights which are guaranteed to the citizen by the constitution. So, in this case. Neither the constitution nor the statute directs the giving of such instruction, nor forbids a conviction without it. Moreover, such an instruction is not proper under the decisions of this Court "When the jury have been properly permitted to view the premises in dispute, it is not improper to refuse a request which requires the court to instruct the jury that they are not to take into consideration anything they saw or any impression they received at the view of the premises, in determining the rights of the parties to this suit." *Fox* v. *Railroad Co.,* 34 W. Va. 466.

Objection is also made to the form of the verdict which reads: "We, the jury, find the defendant, State Henry, guilty of murder in the first degree as charged in the within indictment." The argument is that all murder is presumed to be murder in the second degree unless the State elevate it to murder in the first degree by establishing the characteristics of that crime, and that there is no such thing as an indictment for murder in the first degree or second degree. Citing *Schnelle's Case,* 24 W. Va. 267; *Cain's Case,* 20 W. Va. 681. The words "as charged in the within indictment" are unnecessary and may be considered mere surplusage, but, if not so considered, they cannot affect the validity of the verdict. While there is no such thing as an indictment purporting on its face to be an indictment for murder of the first degree only or murder of the second degree only, an indictment in the statutory form will support a conviction of murder in either degree. In legal effect it is an indictment for manslaughter, for second degree murder and for first degree murder and on it a conviction of any one of these crimes will be upheld, if regular, and sustained by

the evidence. Hence, these unnecessary words do not contra-
dict the material and essential part of the verdict. While the
indictment does not say, and an indictment cannot be made to
say, in terms, that it is an indictment for murder in the first
degree, in legal effect, it is an indictment for murder of the
first degree. The presumption that homicide, when shown, is
murder of the second degree, is a rule which relates to the proof
and not to the indictment.

It now remains to inquire only whether the evidence was
sufficient to support the verdict. From the statement of the
case it is apparent that the conduct of the prisoner, as shown
by the evidence of the State, is decidedly incriminating. The
argument found in the brief as well as the oral argument at the
bar is based almost wholly upon the evidence introduced by the
prisoner to overthrow the evidence of the State tending to estab-
lish the acts from which the inference of guilt is so plainly de-
ducible. This argument, on its face, impliedly admits the suf-
ficiency of the evidence of the State to sustain the verdict, if
this explanatory testimony in behalf of the prisoner were not
in the record. This is a virtual admission that this Court is
powerless to interfere with the verdict. On this question the
rule is that, where the evidence, and not the facts proved, is cer-
tified in the bill of exceptions, the appellate court will not re-
verse the judgment, unless, after rejecting all the conflicting
oral evidence of the exceptor and giving full faith and credit to
that of the adverse party, the decision of the trial court still
appears to be wrong. *State* v. *Baker,* 33 W. Va. 319. *State* v.
*Davis,* 31 W. Va. 390; *State* v. *Flannagan,* 26 W. Va. 116;
*State* v. *Chambers,* 22 W. Va. 779; *State* v. *Thompson,* 21 W.
Va. 741. It is not intended by referring to the virtual admis-
sion of the sufficiency of the State's evidence to intimate that
counsel for the prisoner in a capital case, may admit his guilt
or waive the question of sufficiency, but only to show that the
case made by the State is so complete and perfect that there
is not a discrepancy nor a missing link in its chain of circum-
stantial evidence. Nothing is left except to assail, and attempt
to take by storm, some of the State's positions. In the absence
of the testimony for the prisoner there is clear and unequivocal
evidence that he was the last man in whose company the de-
ceased was seen. When last seen they were going in the direc-
tion of the place where the dead body was found. What is the

answer to this, one fact forming a principal link in the chain of evidence? Only that the prisoner says he and the deceased came back up into the road and separated, the deceased going to overtake Parks, McCissom and Hunter, following the light. To what extent is this statement corroborated? Who swears to it except the prisoner himself? Willie Wilson says he heard Henry tell Richardson to go ahead and overtake the light and that he (the prisoner) would catch him. But they differ as to the time, a very important matter. Wilson swears that when this took place Parks, Hunter and McCissom were there. If they were there, they could not have been at the engine-house with a light. Moreover, they all swear that they never saw John Richardson alive after he and the prisoner left them on the road between the commissary and the saloon. Another important question in this immediate connection is, what about the apples? The prisoner says he left them at Willie Wilson's shack. Wilson must have gone home almost immediately after the time when he says he left them there. But Wilson never saw them. It is argued that the evidence shows that Brown got them. There is absolutely no evidence in the record that anybody got them. According to the argument one witness said Brown said he got them. When did such evidence as that become competent? Where was Brown that he could not be called to testify to that if it was true? What effort was made to get him? If an unsuccessful effort was made, does that make hearsay evidence competent? What became of these apples which had been talked about on the works in the presence of Richardson and was the pretext or means by which he was lured off in the direction of the field where his dead body was found the next day? What concern did the prisoner manifest about those apples that night or the next day? So precious were they that he had hidden them in the brush, but afterwards he deliberately took them and set them on a table outside of another man's shanty where any one passing by could pick them up and carry them off. He made no inquiry for them that night nor the next morning. The subject which had been so important to him during the day might well have justified some definite reply when Parks inquired about them as the prisoner started up to his shack after returning from Porter's Falls. A little thought will suggest numerous other inquiries respecting the inconsistency of this matter, but why pursue

them? Here is enough to show decided weakness in this story, amply enough to cast discredit upon it in the minds of the jury. Might not the jury well infer from all this inconsisctency that these apples had no existence in point of fact, that they were mythical, and that what was said about them was simply a deliberate and false creation and representation of the prisoner to induce his intended victim to leave his other associates and accompany him down into the woods and cross the creek where a deadly blow with a hammer, obtained and secreted for the purpose, would strike him down so certainly and suddenly as not to permit even a cry or a groan that might be heard? The improbability of this story of the separation of the prisoner and the deceased at the commissary was a matter for the consideration of the jury. Would John Richardson, knowing that but a few minutes before Parks, Hunter and McCissom had gone on down to the saloon to wait for them, simply upon a conjecture or guess or suspicion that they had gone back up the road, start off in the gathering dusk of the evening to follow a light, of which he knew nothing certainly, through the tunnel? Would Hunter, McCissom and Parks, having thus, by accident and without notice or expectation, fallen in with Richardson, have suddenly conceived and executed a design to murder him for his little bit of money? Is the mail of an ordinary working man, such as the prisoner was, so important in the matter of the time of its reception, as to induce him to separate from his four companions all of whom had agreed to go together to Porter's Falls on account of the danger of robbery on the night of pay day, and go alone? All this was for the analysis, scrutiny and determination of the jury. It is not in the power of either the trial or the appellate court, under the law, to take from the jury these questions, upon a motion for a new trial or otherwise. Their determination is absolutely the province of the jury and the court has nothing to do with it. The disclosure by the prisoner, immediately after this murder appears to have been committed, of just about the amount of money drawn by both the prisoner and deceased, while not a cent was found upon the body of the deceased, called loudly for explanation. That is so evident that no reasonable human being could deny it. The explanation was forthcoming. But what of its character? What tribunal has the determination of its sufficiency? None other than the jury. So, of all the other questions of fact.

The proceedings being regular, there being evidence tending to support every material allegation of the charge, and the jury having found upon the facts ascertained by them that the defendant is guilty, the law permits no interference with that verdict. The courts cannot put aside the law. If it can be done in one instance it can be done in all, and law and order would come to an end. The rule is imperious and inexorable.

There is no error and the judgment may be affirmed.

*Affirmed.*