# CHARLESTON.

STATE v. JOHN W. HEDRICK AND ARTHUR HEDRICK

(No. 5221)

Sumbitted May 19, 1925. Decided May 26, 1925.

1. HOMICIDE—*Referring in Instruction to Club With Which Blow Was Struck Causing Death as Deadly Weapon Held Not Erroneous.*

   When death is caused by a blow on the head delivered with a green, hardwood club, about one inch and a quarter in diameter and nearly four feet in length, it is not error at the trial of one charged therewith, tor the court to refer to the club in an instruction as a "deadly weapon". (p. 534).

2. CRIMINAL LAW—HOMICIDE.

   Point 1 of the syllabus in the case of *State* v. *Henry,* 51 W. Va. 283, points 2, 6 and 7 of the syllabus in the case of *State* v. *Welch,* 36 W. Va. 690, and point 4 of the syllabus in the case of *Maxwell* v. *Kent,* 49, W. Va. 542, followed and applied. (p. 533).

3. HOMICIDE—*If, in Assault on Father, Son is Killed by Blow on Head With Deadly Weapon, Intent to Kill May be Inferred.*

   When, in the commission of a premeditated and malicious assault on one made for the avowed purpose of *beating him up,* the son of the one assaulted is struck on the head with a deadly weapon by the man making the assault, and death results, the intent to kill may be inferred by the▲ jury. (p. 536)

Error to Circuit Court, Grant County.

John W. Hedrick and Arthur Hedrick were convicted of murder in the first degree, and they bring error.

*Affirmed.*

*Taylor Morrison, E. L. Judy, A. J. Welton* and *Horace P. Whitworth,* for plaintiffs in error.

*Howard B. Lee,* Attorney General; *Isaac D. Smith,* Prosecuting Attorney, and *L. J. Forman,* and *J. S. Zimmerman,* for the State.

HATCHER, JUDGE:

A jury of the circuit court of Grant county found the defendants guilty of murder in the first degree for killing Alonzo Sites. Upon a recommendation of the jury, the defendants were sentenced by the court to life imprisonment in the penitentiary. From this judgment, the case is here on error.

George W. Sites and John W. Hedrick owned adjoining tracts of land in Grant county. Bad feeling had existed between them for a good many years. An old abandoned county road is located close to a boundary line between these farms. From a map filed, it seems to be on the Hedrick farm. Sites claimed half of this road, and thought he had a right to use it. At the time of the trouble, Sites had been hauling over the old road. The evidence discloses no harm done to the road or to Hedrick's property by Sites. But Hedrick did not like to see Sites using the road. It irritated him, and made him unhappy. It produced in him much the same frame of mind that caused Haman to worry when he saw Mordecai sitting at 'the King's gate. That mental condition led to all this trouble, just as it caused the destruction of Haman. The matter preyed on Hedrick's mind until he complained of Sites to his son, Arthur, (a man of 42 years), even as Haman complained to his wife, Zeresh, of Mordecai. And the son took up the gage of battle for his father, just as the wife did for Haman. Zeresh planned to have Mordecai hung —Arthur planned an attack on Sites.

Hedrick finally sent word to Sites to stop using the road. This message was communicated to Alonzo Sites, aged 15 years, who was the son of George Sites, and by Alonzo, delivered to his father on the very day that Alonzo was killed. Sites disregarded the message, and he and Alonzo were coming out over the road with a load when they were met by Arthur Hedrick and a boy named Charley Michaels, aged 15 years, who was being raised by John W. Hedrick. According to Michaels, Arthur Hedrick had requested him to assist in beating up Sites, and had showed Michaels where to get some clubs for the purpose, which they then had with them. These clubs were of green hard wood, and averaged

about an inch and a quarter in diameter and nearly four feet in length.   John W. Hedrick was not immediately with the two at the time they met Sites, but was in a field nearby. According to Michaels, John W. had said he ''would be there if we needed any help.''   He also had a club of green wood. Sites described what then happened in the following language:

> ''After we crossed the creek and started up the slate bank Arthur Hedrick and Charley Michaels stepped up in front of the horses and each one had a club in their hands and commenced hollowing, I guess not, I guess not, and I got off the sled and took the axe in my hands and I took the axe and slapped the horses over the rump and thought that that would make them go by, and when they would not let the horses go any further I took the axe in the left hand and thought maybe I could lead them by and when I got to the horses heads they commenced striking at me with their clubs and then I took the axe in both of my hands to knock their licks off to keep them from hitting me in the head. * * * * *
>
> They were striking at me with their clubs and I was trying to knock the licks off and in trying to do this I struck Arthur right here with the pole of the axe and when I struck him he bent over and commenced hollowing that I had broken three ribs for him.   Charley kept on striking at me and finally he hit me and knocked me part of the way down and then I dropped the axe and that was the last I saw of the axe and when I raised up from there I got hold of Charley Michaels and pushed him back against the bank and tried to get a hold of his neck but I couldn't, then he struck my hands and by that time John Hedrick come up and I got hold of him and threw him down with his head against the bank and was holding him there and Charley Michaels come up behind me and got to pounding me on my right shoulder and I reached around and got hold of his club to keep him from clubbing me and then Arthur Hedrick stepped in and hit me here with his club and that knocked me back against the bank and that let John W. Hedrick up and he stepped up with his club and said 'let me kill the son of a bitch' and Arthur said, no that he has had enough now,

and when Arthur would not let them strike me over the head he struck me across the legs and then he turned around and said 'kill the little devil, kill the little devil' and Arthur turned around and struck Alonzo over the head. * * * * *

After they knocked him down the boy got up and went back and got upon the sled, and he had not much more than got on the sled when they started back after him with their clubs, one on each side. * * * * *

When they started back towards him he jumped off the sled and run over in my field. After he got over in the field I got up and started back to the sled and John W. Hedrick started back with me and said 'I guess you will keep out of here now', he said some kind of an oath, but I just don't remember what it was."

Sites further testified that he believed that Arthur Hedrick saved his (Site's) life at the time John W. Hedrick was trying to hit him by preventing John W. from doing so; that he (Sites) and John Hedrick walked down to the sled afterwards, Hedrick still having in his hand a club; that Hedrick could have struck him at that time had he so desired; that there were no further licks struck after Alonzo had been knocked down; that after Alonzo got home, he helped to do the feeding, but seemed nervous and complained of his head hurting, and that after a while he became sick, etc., and died about 11 o'clock that night.

The post mortem examination showed that Alonzo had a fractured skull, and that a blood clot had formed on his brain about two and one-half inches in diameter, and about one-half inch thick. One of the physicians testified that Alonzo's skull was not quite as thick at the point where he was struck as the normal skull.

Charley Michaels testified as a witness for the State, and confirmed the testimony of George W. Sites in practically every detail. Michaels further stated that when Sites got off the sled and hit the horses to make them go on, Sites said "Let me by" and that we said, (having reference to Arthur Hedrick and witness) "I reckon not—I reckon not;" that when George Sites dropped his axe during the fight, Arthur

Hedrick threw the axe over the fence into Sites' field, and that after Arthur had struck Alonzo in the head, John W. Hedrick hit Alonzo on the back. One of the physicians testified that there were some abrasions or bruises of the skin on Alonzo's back.

The testimony of the defendants is that when Arthur Hedrick met George Sites, he requested George to "reason something about the fence and close up this," and that George at once got off his sled and attacked Arthur and Michaels with his axe. Arthur testified that he pleaded with George not to hit him; that he did not want any trouble, and that he used his club solely to ward off George's licks; that John W. Hedrick came up about that time, and George Sites then attacked him; that while John W. was defending himself from the attack of Sites, Alonzo came up from behind and struck John W. with an axe over the head and shoulders, and then Arthur hit Alonzo across his arm and shoulders and knocked the axe from his hands. Thereupon, the boy ran away. A physician testified that he examined Arthur and John W. Hedrick after the fight; that Arthur had one rib cracked, and that John W. Hedrick had a little abrasion about the size of a silver dollar on the top of his head, which had bled just enough to clot the hair.

The state also introduced the opinion of a competent witness that certain stains on the clubs used by the Hedricks on this occasion were blood stains. The defendants say that the admission of this testimony was prejudicial error. Evidence in regard to these clubs was clearly proper under *State* v. *Henry,* 51 W. Va. 283. The opinion of the witness that the stains thereon were blood stains was equally competent under *State* v. *Welch,* 36 W. Va. 690. This ruling is in no wise affected because it was not shown that the blood on the club was the blood of Alonzo Sites. This testimony was clearly admissible to aid in identifying the clubs used, as well as for the purpose of showing the viciousness of the assault.

The defendants charge error in permitting Michaels to testify, "since", as their brief states, "they could not be aiders and abettors to him. The indictment does not so charge them and does not put them on notice to defend

against such a charge." It is not necessary for us to discuss this charge of error, because the defendants made no objection at the trial to Michaels as a witness for the State. It therefore follows, that the defendants cannot now be heard here on an objection which was not made to, and passed on by the trial court. *State* v. *Price,* 92 W. Va. 566; *Maxwell* v. *Kent,* 49 W. Va. 542; *Newberry* v. *Watts,* 116 Va. 730.

Error is also alleged in the exclusion of evidence offered by defendants to show that John W. Hedrick was the owner of the land where the conflict occurred. Counsel cite in support of their contention *State* v. *Flanagan,* 76 W. Va. 783, which holds that a proprietor may use such reasonable force as may be necessary to expel the trespasser from his premises, in case the trespasser, after requested, refuses to leave.

We fail to see how the argument or the citation, can apply to this case. The defendants did not testify that they requested George and Alonzo Sites to leave the old road at the time of the altercation, or that Alonzo Sites was killed in the use of reasonable force necessary to expel him therefrom. The only request made by Arthur Hedrick of George Sites was that he "reason" about a fence and the closing up of the road. The evidence of defendants is that George Sites, without cause, attacked each one of them. If that were true, they had the right to defend themselves, and that right did not depend on Hedrick's ownership of the old road. That right existed, in case of unwarranted attack on them on the property of a third party, or on the property of George Sites, as well as on land of the Hedricks. That right in no wise depended on the ownership of the land where the assault occurred, and we see no error in the trial court's refusal to permit the defendants to show that John W. Hedrick owned the old road.

There was no dispute about the dimensions and conditions of the clubs used by defendants in this affair. They allege error, however, in the giving of certain instructions by the court wherein the club used by Arthur Hedrick is referred to as a "deadly weapon". They contend that the court should have left it for the jury to say whether this club was in fact a deadly weapon.

Ordinary observation and experience teaches us that a severe lick on the head by a club of green wood the size of that used by Arthur Hedrick is likely to induce death or great physical injury. We therefore perceive no reason for submitting to the jury the determination of whether this club was a deadly weapon, when that fact was self-evident and within the knowledge of all. A deadly weapon has been defined to be "one by which death would likely be produced when used in a manner in which it was shown to have been used in a particular case". Brills' Cyc. Crim. Law, sec. 627.

> "Where accused struck decedent on the back of the head with a rock, causing the dislocation of the neck of decedent and a hemmorrhage, from which death immediately ensued, the rock was a 'deadly weapon', though its size was not shown".
>
> *State* v. *Miller*, 175 S. W. (Mo.) 187.

Bishop on Statutory Crimes, par. 320, defines a deadly weapon as a weapon "likely to produce death or great bodily injury". In commenting on a deadly weapon, this author states:

> "And when the facts are all established, the question whether a particular weapon was deadly or not is of law for the court."

In *State* v. *Phillips*, 10 S. E. (N. C.) 463, a large, heavy stick or club was held by the court to be a "deadly weapon".

> "Whether an instrument or weapon be a deadly one, is, at least generally speaking, for the decision of the court; because it is a matter of reason, that it is, or is not, likely to do great bodily harm, which determines its character in this respect. * * * Hence, it is clear that * * * or any other heavy instrument, by a blow from which a grievous hurt would probably be inflicted, are deemed in law, deadly instruments."
>
> *State* v. *West*, (N. C.) 6 Jones 509.

The court in that case also held that:

"An oaken staff, near three feet long, of the diameter of an inch and a half or two inches, with which three blows were stricken upon the head of a man while drunk and unawares, shattering the bones of the head, and rupturing the interior vessels of the brain, was a deadly weapon, and a killing by the use of it in that way, was murder."

The defendants also allege error in several instructions given by the court wherein murder in the first degree was defined. Particular complaint is made of one instruction wherein the court defined the degrees of crime chargeable in this case, and stated to the jury that "under the evidence in the case" the jury might find that the defendants were guilty of murder in the first degree, or in the second degree, or voluntary manslaughter, or involuntary manslaughter, or assault and battery, or not guilty, according to which verdict the jury thought warranted under the evidence and instructions of the court. The defendants contend that these instructions were all wrong, under their theory that the evidence did not justify a verdict of a greater degree than manslaughter. Had some of the members of this court been on the jury, they would not likely have returned a higher verdict in this case than second degree murder; but we have no right to substitute our personal conclusions from the evidence for those of the jury, unless we can see that the jury was clearly wrong. We cannot say that the verdict herein was the result of prejudice. There was sufficient evidence in the case upon which to base a verdict of first degree murder. We are of opinion that neither of the Hedricks commenced this assault with the intent to kill George or Alonzo Sites. There were times during the combat when it is clear that Arthur Hedrick did not intend to do murder. But from his conduct in striking Alonzo that terrible blow with that deadly weapon on that vital spot, following the command of his father "to kill the little devil", the jury had the right under the law to infer malice and intent to kill, or to do great bodily harm.

"A man is presumed to intend that which he does, or which is the immediate or necessary con-

sequence of his act; and. if the prisoner, with a deadly weapon. in his possession, without any, or upon very slight provocation, gives to another a mortal wound, the prisoner is *prima facie* guilty of wilful, deliberate, and premeditated killing; and the necessity rests upon him of showing extenuating circumstances; and unless he proves such extenuating circumstances, or they appear from the case made by the State, he is guilty of murder in the first degree.

The question whether a particular homicide is murder in the first or second degree is one of fact for the jury. Where a jury has found the case to be one of murder in the first degree, as in other cases, the court should not disturb the verdict, unless the finding of murder in the first degree be plainly and manifestly contrary to or without sufficient evidence.''

*State* v. *Welch, supra.*

''In some cases the intent necessary to constitute murder need not be an intent to take the life of the person slain, but an intent to do serious bodily injury, without legal provocation, excuse, or justification, followed up by the homicide, constitutes murder. If defendant in malice wilfully strikes and wounds deceased with a club or stick likely to produce death or great bodily harm, without a specific intent to kill him, but with the intent to inflict upon him great bodily harm, and if deceased comes to his death by the wounds inflicted under such circumstances, then defendant is guilty of murder in the first degree. So it has been held that to constitute murder, the intent need not be to take the life of the person killed, or even to inflict a personal injury upon him, but it must be equivalent in legal character to a criminal purpose aimed against life; and generally there must be an intent to commit either a specific felony, or at least an act involving all the wickedness of a felony; and, if the intent be directly to produce a bodily injury, it must be such an injury as may be expected to involve serious consequences, either periling life or leading to great bodily harm.

And it is held to constitute murder, if the accused conceived a design to assault deceased, and

in consequence of such assault he died, whether accused intended to kill him or not."

Michie, Homicide, par. 9, p. 73.

"The grade of a homicide is not reduced to involuntary manslaughter or otherwise by the fact that the intent of the slayer was to wound or cripple, and not to kill. And where six men assault another, and in the course of the assault one of them inflicts a wound upon the person assaulted, which causes his death, he is guilty of murder, though he did not intend to kill, but only to inflict bodily harm."

Wharton on Homicide, par. 87.

The plea of counsel that the "faults" of the defendants are "worthy of birchen twig" only is not well considered. Neither can counsel successfully challenge the sentence of defendants on the ground that it is not "equal punishment". The fate of the defendants is indeed severe, but the verdict of the jury may be justified under the very rule invoked by counsel. The law of "equal punishment"—of an eye for an eye, and a tooth for a tooth—would mete out to the defendants the punishment of the bludgeon rather than that of the "birchen twig".

We find no error in the record prejudicial to the defendants. The judgment of the circuit court will therefore be affirmed.

*Affirmed.*