# CHARLESTON.

STATE *v.* GEORGE SAUNDERS

(No. 6418)

Submitted November 6, 1929. Decided November 12, 1929.

*J. E. Peck* and *T. C. Townsend,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

MAXWELL, JUDGE:

The defendant was convicted in the circuit court of Logan county of the murder of Dennis Smith and was sentenced to be hanged. He prosecutes this writ of error.

Evidence introduced by the state warranted the jury in believing that about one o'clock in the morning of July 1, 1928, the defendant approached a group of some five or six young men who were standing near a railroad track in the town of Lundale in Logan county, and without provocation, fired three shots from a revolver, the second of which passed through the body of Dennis Smith and into the body of Gus Bloxton, each of whom died of his wound; that after the shooting, when his conduct was questioned by one of the group, he threatened to do further violence if he was bothered.

According to further evidence adduced by the state the defendant, at the time of the shooting, seemed to be imbued with the belief that some of the group had manifested an improper attitude of some sort toward Brooks Canaday with whom defendant had been walking a moment before. They say that immediately after firing the shots he declared that somebody had "mussed up Brooks", or "messed Brooks Canaday up" and "when they mess with Brooks they are messing with me." One of the witnesses says that defendant then said he "was going to mess up somebody"; a second witness quotes him as saying: "I am going to mess everybody up tonight that I can." Still another quotes him: "I am going to kill all I can." While these witnesses do not repeat his words in the same manner it is evident that they were all impressed with the fact that he was verbally threatening to do violence.

The defendant, as to whose previous good reputation as a law-abiding citizen a number of substantial witnesses testify, says that he came into possession of the revolver just a few minutes prior to the shooting when he took it away from Katie Canaday who was threatening to shoot her husband with it. There is no evidence of intoxication of any of the persons to whom reference is made. Defendant says that he had no ill will toward either Smith of Bloxton or any of the others in the group where they were; that as he approached the group he fired one shot into the air merely because others in the group were shooting. He says that Curtis Hutchinson, Robert Moody and Walter Watson were all shooting. They deny this. Their evidence and the evidence of Mrs. Ethel

Adkins, who saw the shooting from the front porch of her home a short distance away, and of Henry Green, who, from his home nearby heard the shots but did not see the shooting, is that there were only three shots fired at that place.

The contention of the defense that the evidence can in no aspect be deemed to be sufficient to sustain a verdict of first degree murder is not well taken. It is admitted that malice may be inferred from the use of a deadly weapon, but it is urged that the facts here involved do not come within the terms of the statute defining first degree murder. Code, chapter 144, section 1. It is said that the state's evidence does not establish "wilful, deliberate or premeditated killing" as required by the statute in order to raise murder from second degree to first degree. This position overlooks well settled law. "If a person maliciously and without provocation fires a gun charged with a deadly load into a crowd regardless of consequences and kill an innocent bystander, he is guilty of murder, and it is for the jury to say from the facts and circumstances whether such killing was wilful, deliberate and premeditated." *State* v. *Young*, 50 W. Va. 96. As stated in the South Carolina case of *State* v. *Smith*, 2 Strobhart, 77, cited in the *Young* case, "* * * the law will imply that the prisoner intended the natural and probable consequences of his own act, as in the case of shooting a gun into a crowd, the law will imply, from the wantonness of the act, that he intended to kill some one, although it might have been in sport."

A famous writer on criminal law has said: "It is sufficient if the circumstances were such as to show a heart regardless of social duty and fatally bent on mischief. Express malice appears when the circumstances show such a reckless disregard of human life as necessarily to include a formed design against the life of the person slain. * * * So, if a man recklessly and maliciously throw from a roof into a crowded street, where persons are constantly passing and repassing, a heavy piece of timber, calculated to produce death to such as it might fall on, and death ensue, the offense is murder at common law. So, also, it is murder maliciously to fire into a crowd." Warton on Homicide, sec. 90. See, also, 13 Ruling Case Law,

p. 740; *Washington* v. *The State,* 60 Alabama 10; *People* v. *Stein,* (Cal.) 137 Pac. 271. "Where the act of killing shows an abandoned and malignant heart, the defendant is guilty of murder in the first degree." Michie on Homicide, Vol. 1, p. 143.

The denial of a continuance is assigned as error. The motion for a continuance was predicated mainly on the absence of Brooks Canaday and Katie Canaday for whom process had been issued and was returned "not found". The defendant, in support of his motion for continuance, testified, in substance, that he desired to prove by them the nature of the revolver and its loads, other shooting at the time of the trouble, and that he did not kill Smith and Bloxton; that he had just been informed the preceding evening that they were in Raleigh county. While the defendant was under examination on the motion for continuance his counsel stated to the Court: "Your Honor, I had been informed that the undertaker over here at Cherry. Tree Bottom had removed the bullet from the dead body, but he came to the court room this morning, and he informs me that was done at the Klingle Undertaking Parlors in Huntington, and that the man down there has it. I want time to get that undertaker. Of course, that will be a very material point." On the motion for continuance or postponement it was not made to appear that Brooks Canaday or his wife would be in position to testify as to any material fact that was not within the knowledge of other witnesses who were present at court. Nor was it made to appear to the court in what manner it would be material to the defense to cause to be produced at the trial the bullet which was taken from the dead body of Gus Bloxton. It is not evident that the refusal of a continuance involved either an abuse of judicial discretion or prejudice to the defendant. Therefore, the trial court committed no error in denying a continuance or postponement of the trial.

Now as to the alleged error in the court's refusal to set aside the verdict and award a new trial. It appears in the evidence at the trial that the revolver which the defendant used was found at about the place where he told the officers he had thrown it, and that when found it contained three

empty cartridges and that the undischarged cartridges in the other chambers were loaded with lead bullets. The physician who examined Dennis Smith after he was injured and before he died testified that the bullet which struck him entered in front and came out in the rear; that the wound in front was clean-cut, and at the rear "It was somewhat torn, larger than the wound of entrance." And, further, with reference to the wound, "Well, it was rather clean-cut, and it looked like it might have been a steel-jacketed bullet, but then I couldn't be positive of that." There was offered in evidence the testimony of John Burns, an undertaker, who took the body of Bloxton from Huntington to Logan county for burial. He says he visited the undertaking establishment in the city of Huntington where Bloxton's body was prepared for burial; that he saw there a bullet which he was told by one Coleman, an undertaker, that he had taken from the body of Bloxton, but the court did not permit Burns to testify as to the size or character of the bullet. This exclusion of evidence was, of course, correct as the matter clearly involved hearsay.

It having developed on the trial that other shots were fired in the vicinity of the group of men where Smith and Bloxton were shot, and within a moment or two after the instant at which the state's witnesses say that the defendant fired three shots, and the undischarged chambers of the revolver which defendant used disclosing lead bullets, and the physician who examined Smith having expressed the opinion that possibly the wound was made by a steel-jacketed bullet, counsel for the defendant conceived the idea that maybe the bullet which killed Smith and Bloxton was not fired from the revolver in the hand of the defendant, but was fired by some one else in the vicinity. It was therefore urged that a new trial should be granted to afford opportunity for the body of Bloxton to be exhumed for the purpose of removing the bullet to determine its character. In support of the theory that the bullet is still in Bloxton's body there was filed in the trial court an affidavit of Dr. H. D. Hatfield to whose hospital at Huntington Bloxton was taken after his injury. The doctor says: "No attempt was made by affiant or anyone else in connection with the hospital to remove the bullet because of the condition

of the patient, and that the bullet was not removed by affiant either before or after the death of the patient, and in so far as affiant knows or has knowledge the bullet still remains in the body.'' This in no way controverts the idea that the bullet may have been removed by the undertaker. The absence of an affidavit of the undertaker either that he did or did not remove the bullet is noteworthy. It is conspicuous in its absence. It seemingly would have been very easy to set the matter at rest by such affidavit and thus definitely to have informed the trial court as to the bullet. It would have been a vain thing to grant a new trial for the purpose of affording opportunity to exhume the body to get the bullet when it did not appear with any certainty that the bullet remained in the body. And, again, if the bullet was in fact removed by the undertaker Coleman, and it was a steel-jacketed bullet or a different size from that used in the revolver which was in the defendant's possession, the trial court should have been furnished that information by the affidavit on the motion to set aside the verdict. Again we say the absence of any affidavit on that subject arrests attention. Therefore, so far as the bullet matter is concerned, a sufficient showing was not made to the trial court to warrant a setting aside of the verdict. If it is made hereafter satisfactorily to appear that the bullet which killed Smith was steel-jacketed or of a variant size from that employed by defendant, that fact can be emphasized on a request for executive clemency.

A careful review of the record in all its phases fails to disclose any error prejudicial to the defendant. The judgment of the trial court is therefore affirmed.

*Affirmed.*