63 S.E.2d 69 (1950)
STATE
v.
BURDETTE.
No. 10274.
Supreme Court of Appeals of West Virginia.
Submitted September 12, 1950.
Decided December 12, 1950.
Rehearing Denied February 12, 1951.
*72 D. L. Salisbury, D. Boone Dawson, Charleston, plaintiff in error.
William C. Marland, Atty. Gen., George W. Stokes, Asst. Atty. Gen., defendant in error. *70
*71 GIVEN, Judge.
At the September, 1949, term of the Intermediate Court of Kanawha County, an indictment for murder was returned by the grand jury against Harry Atlee Burdette and Fred Clifford Painter. The indictment charged that the defendants "on the ___ day of July, 1949, in the said County of Kanawha, feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder one Edward C. O'Brien against the peace and dignity of the State." On the 6th day of December, 1949, Burdette, then represented by counsel, entered a plea of not guilty and, each of the defendants having demanded a separate trial, and the State having elected to first try Burdette, a jury was impaneled and duly sworn to try Burdette. The trial continued until the 9th day of December, 1949, on which day the jury returned the following verdict: "We the Jury find defendant guilty as charged of 1st degree murder without recommendation." After overruling a motion to set aside the verdict, the court, on the 15th day of December, 1949, entered judgment against Burdette in accordance with the verdict, that he "be punished with death", on the 14th day of April, 1950, by electrocution. On March 14, 1950, Burdette filed in the Circuit Court of Kanawha County a petition praying for a writ of error and supersedeas to the final judgment of the Intermediate Court of Kanawha County, and on March 20, 1950, the circuit court denied the prayer of the petition. This Court granted a writ of error and supersedeas on the 28th day of March, 1950, to review the action of the circuit court. Painter was later tried under the indictment mentioned above, found *73 guilty by a jury, sentenced to death, and this Court granted a writ of error and supersedeas to the final order of the Circuit Court of Kanawha County refusing to review the action of the Intermediate Court of Kanawha County, and the decision of the Court in that case is rendered contemporaneously herewith. See State v. Painter, W.Va., 63 S.E.2d 86.
On Saturday, July 30, 1949, just before midnight, a fight wherein Burdette, Painter and O'Brien were involved, resulted in the death of O'Brien. This fight occurred on or near the westerly side of Summers Street in the City of Charleston, between Lee Street and Washington Street. The Greenbrier Theatre, fronting on Lee Street, is situated southerly from the place of the fight, and a large dwelling is situated immediately north of the rear of the theatre. The easterly wall of the dwelling extends practically to the edge of the westerly sidewalk of Summers Street. Immediately north of the dwelling, toward Washington Street, is an automobile parking lot. There is an entrance to the dwelling on the side thereof next to the rear of the theatre building, and another entrance thereto on the side thereof next to the parking lot. The Stevens Beauty Shop is located in this dwelling, and Alice Cobb, a girl friend of O'Brien, occupied rooms therein. Apparently the fighting commenced on the parking lot near the entrance to the residence, and continued to the sidewalk along the easterly side of the residence. On the opposite side of Summers Street an alley intersects that street at right angles and extends in an easterly direction toward Capitol Street. A store mentioned in the evidence as The Curtain Shop is located in a building which fronts on Lee Street and extends along the easterly side of Summers Street to the alley. The record does not disclose the distance from either Lee Street or Washington Street to the place where the fight occurred, but the distance from Lee Street was probably about 100 feet and further from Washington Street.
On Saturday, July 30, 1949, at about 11:45 P.M., O'Brien got out of a taxicab near the rear of the Curtain Shop on the easterly side of Summers Street, near where the alley intersects Summers Street, the taxicab being headed toward Washington Street, and, while paying the taxi fare, was asked by either Burdette or Painter if he wanted to purchase a newspaper. O'Brien answered in the negative and, after having paid the taxi fare, went around behind the taxi and started across Summers Street. Burdette or Painter then asked Beaver, the taxi driver, if he wanted to buy a newspaper, to which Beaver replied that he "had no use for a paper". Beaver then backed his taxi into the alley, turned and drove toward Lee Street. After Beaver had turned the taxi toward Lee Street he heard loud voices, looked back out of his taxi, and testified that "They just got across the street and about that time I seen some kind of scuffle and then some people come up and it was shadowy and I couldn't see very well."
O'Brien, thirty-one years of age, single, five feet six inches tall, weighing about 175 pounds, was an employee of the 7-Up Bottling Company, Charleston, West Virginia, and had driven a truck for that company the day of the homicide. He worked until about five P.M., went to his home, took a bath and had his evening meal. About six-thirty P.M. he left his home, "jolly" and "in a good frame of mind". He was observed by Charles Lightner, a city policeman, about twenty minutes after six P.M., at the corner of Washington and Summers Streets, and nothing unusual was noticed about his actions or demeanor. Between eight and eight-thirty P.M. he went to the Monarch Beer Parlor and remained there until about nine P.M. He then went to the "VFW" Club and remained there until about eleven-forty-five P.M. At about eleven or eleven-thirty he telephoned Alice Cobb, his girl friend, who had a room in the residence above mentioned, obtained a date with her and was requested by her to bring a Sunday morning newspaper and "a drink of wine". He then called a taxicab and left the club in five or ten minutes. Frank Beaver, the taxi driver who answered the call, testified that he drove O'Brien to "about 29 Clendenin Street" and that O'Brien went inside and stayed "two or three or four minutes". It was testified to *74 by John Moore that he, John Moore, operated a "bootlegging business" at 29 ½ Clendenin Street, but there was no showing that O'Brien bought a bottle of wine at the time he was there. Beaver further testified that at the request of O'Brien he drove to the Greyhound Bus Station on Summers Street, that O'Brien went into the station, and that he believed O'Brien made a purchase there; and that he drove O'Brien to the rear of the curtain shop mentioned above. This witness, as well as the other witnesses who were in contact with O'Brien the evening before the fight, testified that O'Brien was sober and was in a good frame of mind. One witness, Lawrence Westfall, testified that O'Brien drank "Two Tom Collins" during the two hours he was in the VFW Club, but that when O'Brien left the club he was sober and "In a good humor".
Burdette and Painter were residents of Charleston, were close friends, and "when not working they were out together a great deal". Neither had been regularly employed for some time. Burdette at time of trial, was twenty-seven years of age, married, and the father of three children. On the morning of July 30, 1949, at about ten-thirty A.M., Burdette and Painter met at a pool room on Summers Street, and remained there until about nine-thirty that evening. Burdette was asked: "Q. Were you there continuously all that time?"; and he answered "A. Yes sir." He was also asked "Q. During the time you were there what did you do?", to which he answered "A. We drank whiskey and beer and shot pool, is all we done." At about nine-thirty that evening they left the pool room and went "to a bootleg joint" on Reynolds Street, "Just long enough to purchase a pint of whiskey." They then went to the Smith beer garden and "drank beer and whiskey". At about eleven-forty-five P.M. Burdette and Painter were back on Summers Street, near the office of the Skyline Cab Company, and left there, going toward the rear of the Curtain Shop, apparently reaching the rear of the building housing that shop at about the time O'Brien arrived there in the taxi driven by Beaver.
There is conflict in the evidence concerning the acts of Burdette and Painter in the commission of the homicide as to whether either used a knife in preventing interference in behalf of O'Brien and as to whether they, or either of them, were intoxicated to such a degree as to render them incapable of premeditation. Inasmuch as Burdette and Painter were acting together in the matter, the evidence as it relates to each should be stated. Witnesses for the State who saw some part of the fight will be first considered.
Myrul Burroughs, Gerald Burroughs and Grover Simmons, acquaintances of O'Brien, on their way to the midnight show at the Greenbrier Theatre, were walking along the westerly sidewalk of Summers Street, near the parking lot, at about eleven-fifty P.M., and saw O'Brien fall from the parking lot to the sidewalk, and saw Burdette and Painter follow him immediately. They stated that O'Brien got back on his feet and that Burdette and Painter continued striking him, and that they, the three witnesses, undertook to interfere in the fight, to stop it, but were prevented from doing so by Painter, who threatened them with a knife. Myrul Burroughs testified that when he saw O'Brien fall O'Brien had a newspaper in his hand, and that he did not have a knife; that Painter came toward him and said "he would cut my (witness) guts out". This witness further testified that Burdette knocked O'Brien down "and started stomping him", and stomped him about the face. Gerald Burroughs further testified that he saw Burdette and Painter strike O'Brien and that when he, Myrul Burroughs and Grover Simmons "started to pull them off they started to fighting and cussing * * *", and that "The next thing I knew Fred Painter was striking me with a knife", and when "Painter came at me with the knife I started backing away and I seen Burdette stomping" O'Brien "in his face and throat." He also testified that O'Brien had no weapon; that he saw O'Brien use his hands only to protect his face; that Burdette and Painter handled themselves "pretty well", and had no difficulty in staying on their feet, and when asked whether Burdette had any difficulty when he was stomping O'Brien, replied "None at all"; and that he thought Burdette and Painter *75 knew what they were doing. Grover Simmons testified to the effect that Burdette and Painter were striking O'Brien with their fists; that he did not see O'Brien do anything "only try to protect his face", and when asked "Did you hear them say anything about cutting somebody?", answered "Yes, I heard them say they would cut him"; that after Burdette knocked O'Brien down he stomped him three or four times, about his face and throat; that he, Myrul Burroughs and Gerald Burroughs tried to stop the fight; that Painter had a knife and was "trying to keep the people back"; that he did not see O'Brien have any weapon; that he saw Painter hit O'Brien a few licks and also stomp him; and that after Burdette stomped O'Brien Burdette and Painter "changed hands with the knife" in holding the bystanders back. He made the following answers to questions asked him: "Q. As to Harry Burdette, I wish you would describe his actions there with reference to how he handled his hands and feet during that fight. A. It seemed to me he knew what he was doing. He knew the way to keep his balance. He had perfect balance. Q. Did he side step any? A. He did when he hit Eddie (O'Brien) the last time. Q. Did you see Painter stagger at any time? A. No, sir." These three witnesses also testified concerning a bottle being thrown at O'Brien by either Burdette or Painter, the bottle being broken, and of the contents thereof smelling like alcohol.
Mrs. Acie Neal, who lived at the residence above mentioned, shortly before midnight heard someone say "If that is the way you want to fight, go ahead and cut him."; that she went out of the residence, saw someone lying on the sidewalk, thought that it was her brother, requested someone to go for an ambulance, and stated that "About that time he (Burdette) was up to me and the guy said `stomp his God damn brains out'", and that Burdette did stomp O'Brien "about three times". Alice Cobb, the girl friend of O'Brien, shortly after she talked with O'Brien over the telephone, heard some loud talking and cursing and heard Mrs. Neal request someone to call an ambulance, and heard someone say "Oh, you want to fight with a knife, do you?". She also testified that she picked up a piece of newspaper by a pool of blood and later turned it over to an assistant prosecuting attorney. Robert Crouse, a former police officer of the City of Montgomery, saw Burdette beating O'Brien and testified that O'Brien was merely protecting himself, "was drooping a little bit like a man out of breath and like he was all in"; that Burdette knocked O'Brien down; that he, the witness, told Burdette and Painter to turn O'Brien loose and that Painter replied "I will cut your God damned heart out"; that after O'Brien was down and after making the above quoted statement, Painter kicked O'Brien, and then he, the witness, "started running for the police". Paul Arthur testified that he saw O'Brien fall to the sidewalk and a newspaper fell from his hand; that O'Brien got up, tried to protect himself, was knocked back down, and Painter "straddled him and he came down on him with his feet"; that Burdette and Painter "seemed to be holding back the crowd", with what he believed to be a knife; and that he "was impressed very much that the two men were drinking."Noble Adkins testified to the effect that he saw Burdette hit O'Brien; that he ran across the street to the Pure Oil Station to call the police; that when he got back to where the fight was going on O'Brien was knocked down; that he started to help O'Brien and was warned by two boys who were with him "* * * not to go in it", and that both Burdette and Painter "stomped the man lying on the sidewalk". Robert McCormick testified that he saw part of the fight, saw O'Brien knocked down, and that Burdette cursed him and started at him. Thereon Stone saw O'Brien down on the sidewalk; saw Painter kick O'Brien at least twice in the upper part of the body. He also testified that a woman requested him to "come over there quick, that somebody was killing her brother", and that he saw a knife on the sidewalk. E. D. Smith, a city policeman, arrived shortly after the fight was over, saw O'Brien lying on the sidewalk, a lot of blood on the sidewalk, and testified that he arrested Burdette and Painter. He also testified that Painter was drunk and that Burdette had been drinking; that *76 Burdette did all the talking, and that Burdette "told Painter to keep his mouth shutthat he didn't do it", and that he took a pint of whiskey off of Painter. Roy Johnson, who had been a member of the city police force for about seven months, arrived at the scene shortly after the fight, saw Burdette and Painter standing sixteen or eighteen paces from the body, and testified that Burdette said to the witness: "The son-of-a-bitch drawed a knife on me and he got what he deserved. You had better go down and help him", and that Painter called the witness "A damned rookie cop." This witness picked up a knife which was partly open and was lying about eighteen or twenty feet from the body of O'Brien, and also took another knife from the right hand front pocket of Painter. When asked his opinion as to whether Burdette and Painter were drinking, he answered: "Well, my opinion is Painter was drinking enough that he was staggering, that is mostly weaving. It wasn't too much of a stagger. Burdette's eyes were glassy but he could talk clearly. I just think he was drinking is all. Leonard Cunningham, also a city policeman, testified that he had known Burdette for about fifteen years; that he saw Burdette and Painter at the scene of the homicide; that Burdette knew him and told him what had happened; that Burdette told Painter to be quiet, and that it was not necessary to help Burdette get into the patrol wagon. Jesse Workman, a sergeant in the city police department, thought that Burdette and Painter were drinking, but thought they knew what they were doing, and stated that Burdette seemed "to know what he was talking about." Dewey Williams, a captain in the Charleston Police Department, was present when Burdette and Painter were brought into police headquarters after the fight and testified that Burdette argued with the patrol driver about keeping some money and that Burdette seemed to know where he was and what he was doing. Charles Lightner, a city policeman, saw Burdette and Painter at Smith's Cafe at 108 Washington Street, East, a few minutes before eleven P.M. on July 30 and there talked with Painter and, in answer to a question, stated: "As far as I could tell they were not drunk.", and that he did not arrest either of them. Jarrett Hunt, an employee of the Skyline Cabs and whose duties were "Loading the cabs and marking the drivers in and out" and who was personally acquainted with Burdette, Painter and O'Brien, saw O'Brien about nine-thirty P.M. and testified that O'Brien was not drinking at that time; that he saw Burdette and Painter a short time before twelve o'clock and that they were then "pretty well loaded", but that they knew him; that when he tried to get them to get into the cab to prevent them from being arrested they said, "Jarrett, we like you but not that much. You tend to your business and we will tend to ours." He also testified that Burdette and Painted walked to the corner of Lee and Summers Streets and that they "did not require any assistance to keep them from falling or staggering." Mrs. Macie Ingraham heard Burdette say that "he could whip anybody without a knife". A brother of O'Brien testified that he roomed with him at his mother's home; that he was familiar with the personal belongings of Edward O'Brien and that he knew that Edward O'Brien did not carry a knife or ever have one in his possession.
The State introduced a photograph showing the residence mentioned above and the immediate surrounding vicinity. Also, certain evidence as to a newspaper picked up at the scene of the homicide was permitted to be introduced in evidence, over the objection of the defendant. K. V. Shanholzer, a chemist and a member of the Department of Public Safety of the State, from an examination of the shoes and clothing worn by Burdette and Painter at the time of the homicide, and from a chemical analysis, determined that there were human blood stains on the shoes of both Burdette and Painter, and on the trousers and shirt of Painter. These articles of clothing were exhibited to the jury; also the shoes, trousers and undershirt worn by O'Brien at the time of his death were exhibited to the jury.
Dr. Freeman L. Johnson examined O'Brien after he was removed to the hospital, found that he was then dead, and that he *77 was bleeding from the nose and both ears, and "we felt he had a fractured skull, but that was not ascertained definitely at that time."
J. G. Bane, who embalmed the body of O'Brien, found "bruises about the face, neck and legs" of O'Brien. Dr. Benjamin Newman, a pathologist, examined the body of O'Brien and "found two lacerations of the skull over the right eyebrow. There were abrasions of the skull, nose, skin and chest. That was just superficial. When I examined the head I found that there were hemorrhages on both sides of the head. They were over his ear to what we call the temporal region. There were hemorrhages of the muscle under the skin of the forehead. When I examined O'Brien I found a mass of hemorrhage on the left side which I call a left subdural hemorrhage; that is, over the coverings of the brain, extending to the very end, and adjacent there was a contusion which was bruised and hemorrhagic. * * *. There was a fracture of the base of the skull on the right side. An examination of the remainder of the body showed an edema but there were no other fractures I could see. * *. The cause of the death was the injury to the brain and the severe hemorrhagethe subdural hemorrhageand the swelling of the brain." This witness further testified that, in his opinion, "It is impossible to explain all those lesions or injuries with one blow. The only way I could say is that it was from several blows."; that the injury was a "dull type of injury. The trauma was dull.", and that he believed "the basal skull fracture was additional to the hemorrhage."
The following witnesses testified on behalf of the defendant Burdette. Oliver Parkins was walking along the westerly side of Summers Street, near the scene of the fight, and saw O'Brien "step on the walk and have a knife in his hand. He said something in a swearing manner, I don't know what it was, to Harry Burdette and Painter on the parking lot. Painter was reaching in his breeches' pocket for a knife. I heard him ask Harry for a knife and Harry said he didn't have one. I saw him strike the man a couple of times and he fell on the sidewalk. The boy laid there just a second and he started to get back and Harry swung at him some pretty hard blows and Harry hit him some more and the boy fell again. When he fell this time his head hit the sidewalk."
Carl Seavers, an acquaintance of Burdette and Painter, appeared at the scene after O'Brien had been knocked to the sidewalk the last time, and testified that he heard one of the officers ask Burdette "Why didn't you run so I could shoot you?", to which Burdette answered that "he (Burdette was a fool but he wasn't that big a fool." This witness saw the officer pick up the knife and stated that it was five or six feet from the body of O'Brien, and also heard Burdette make a statement to one of the officers that "anyone who drew a knife on him would be sorry". He identified the knife found at the scene as one he had seen at the home of Burdette about June 15, 1949. He also stated that both Burdette and Painter were drunk. Russell Guy Harrison testified that he had known Burdette and Painter for several years, was with them the evening of the homicide from about seven P.M. until about ten P.M. He testified that he first got with Burdette and Painter at the Club Pool Room and stayed there until about nine P.M. That the three of them then went to "a beer joint" on the lower end of Washington Street, near the bridge; that they stayed there drinking beer until about ten P.M.; that they then went over and "bought a pint of whiskey", then "went from one beer joint to another beer joint"; that the three of them got in the car of the witness and, after driving around for some time, Burdette and Painter got out of the car near the Skyline Cab stand, on Summers Street. He further testified that when Burdette and Painter got out of his car on Summers Street "they couldn't hardly get out of itthey was so drunk." This witness further stated that on that evening he took Burdette's knife from Painter, that he asked Burdette to let him keep the knife, and that Burdette said "No, he would keep it".
Clyde Legg testified that he saw Burdette and Painter at the "beer joint on *78 Washington Street; that he stayed there from about nine-thirty P.M. until about ten-thirty P.M., and that Burdette and Painter were there when he left; that they were "drinking rapidly", drinking "beer and whiskey". He further stated that in his "estimation they were strictly drunk. They started to dance and stagger around." George Legg, a brother of Clyde Legg, was at the beer joint at the time Clyde was there. He stated that in his opinion Burdette and Painter were drunk. Harry Helmick saw Burdette and Painter in the "beer joint" from eight-thirty P.M. to nine-thirty P.M., and stated that they were drunk. Gerald Wilman saw Burdette at Smith's Cafe, 108 Washington Street, about nine P.M., and stated that Burdette was "plenty drunk". Aileen Burdette, wife of Harry Atlee Burdette, saw her husband sometime during the day of July 30 at the "Club building", and states that "He was awful drunk. I tried to get him to go home with me and he wouldn't do it." Ruth King testified that she saw O'Brien fall to the sidewalk, get up and start striking at Burdette; that "Burdette hit O'Brien and he didn't get up anymore" and that she thought the parties fighting were drunk. Edith Harrell came down Summers Street about the time the fight started, but the only evidence given by her which could be considered material is shown by the following question and answer: "Q. Did you see any of this trouble between Burdette and Painter and the O'Brien boy that night? A. I didn't see no trouble only when Harry was standing on the street. He came across and started to draw a knife, and Harry said, "I will strike any man that draws a knife on me.'"
Fred C. Painter testified in behalf of Burdette. He stated that he was thirty years of age; that he had known Burdette for about eight years; that on the day of the homicide he first saw Burdette "at the Club on Summers Street" about eleven A.M.; that they stayed at the Club until nine or nine-thirty that evening; that they then, together with the witness Russell Harrison, went to 108 East Washington Street; that he does not remember how long they remained there, but does remember going back to Summers Street. He further testified that he and Burdette statrted drinking at about eleven-thirty in the morning and continued to drink beer and whiskey the rest of the day, and that they bought and drank five pints of liquor, except that they gave drinks to their friends; that he bought eight "yellow jackets"; that to the best of his judgment he took four of them and Burdette took the other four, "at the pool room during the afternoon". He testified further that he did not remember where he went after he came back on Summers Street, but did remember "something of a commotion on Summers Street"; that he got three scratches; that he owned no knife; and that he recalled "somebody hollering about a knife". "I went all to pieces" and "didn't know anything until the next day".
Burdette testified in his own behalf, and stated that he went to the Club poolroom around ten-thirty A.M., July 30, 1949, and that he and Fred Painter were there until about nine-thirty that evening; that they then went to a bootleg joint on Reynolds Street and purchased a pint of whiskey; that they then went to the Smith beer garden and stayed there around two hours; that he remembers going to another beer garden and being back on Summers Street, near the Skyline Cab Company office, trying to purchase a paper; that he and Painter "walked out to the corner and there some argument started. Painter went across the street and he hollered for me and I went over there. This boy was trying to cut us both with a knife and we backed off clear into that parking lot"; that "He backed us up in the parking lot and I seen I couldn't get away from him and I had to fight him. I don't remember hitting him," that he was aware of the knife and that "the knife was the first thing that seemed to scare me so", and that after the fight was over he "was in a sort of daze." He further testified to the effect that the knife taken from Painter's pocket was owned by him; that he did not use the knife in fighting O'Brien; and that he and Painter drank four pints of whiskey that day and a bottle of beer about every half hour while at the pool room. When *79 asked if he was drunk he replied: "Yes, sir, I was drunk, but when I saw the boy with the knife it sobered me up. When he backed me against the parking lot I had to fight him as well as I could. I went as far as I could on the parking lot and when I was fighting the boy I blanked out and the next thing that happened I was against this building and then the `law' came."
A statement made by Burdette after his arrest and before "breakfast time the next morning", witnessed by officers S. N. Rutherford and D. E. Williams, was admitted as evidence. Burdette admits signing the statement, but says of the statement that "there is a lot of things that is not right". In so far as appears to us to be material, the statement reads: "I, Harry Atlee Burdette, make the following voluntarily signed statement * * *. No threats or promises have been made to me and I know this statement can be used as evidence in a court of law.
"I left home Friday July the 29th around 6 o'clock in the afternoon. I came to Charleston and stayed down in Charleston Friday night. I got up about noon July 30th, 1949. I loafed and played pool at the Club pool room on Summers Street until near midnight. While I was playing pool I drank a few bottles of beer. * * *.
"Fred Painter drank about the same amount of beer that I did * * *. Fred Painter and I left the Club Pool Room together and started home, walking north on Summers St. * * *. I bought a Daily Mail and Charleston Gazette paper, after we had crossed Lee Street, walking north on eastern side of Summers St. About the midway between Washington and Lee Sts. a man standing on opposite side of Summers Street yelled at me and wanted a paper. I told him I didn't have any papers to sell; that I had bought the papers to take home, and he started to raise hell and started to calling me names. Fred Painter and I walked across the street to where the man was standing, and the man pulled out a knife and started cutting at me. I dodged him and just kept hitting him. I didn't let up. I don't know what happened to his knife but I know when the policemen came they found his knife. I know Fred Painter didn't hit him but while I was fighting with him some other men started to interfere and I think Fred Painter kept them from taking any part in it. I hit this man several times before I knocked him down. * * *. As far as I know I never saw this man before * * *.
"I have read the above statement consisting of three pages written in pencil on yellow paper, and swear it is true and correct, * * *." It will be noted that certain parts of this statement do not accord with the statements made by Burdette on the witness stand or with certain other evidence offered in his behalf.
We think it clear from the evidence that the jury and the trial court were justified in believing that Burdette and Painter were the aggressors throughout the fight; that the assault made by them upon O'Brien was vicious, brutal and continued over a considerable period of time; that after O'Brien had been knocked to the sidewalk the last time by Burdette, both Burdette and Painter continued to kick O'Brien about the head, with such force as to probably produce death, one kicking while the other, by the use of the knife, prevented interference from bystanders who attempted to stop the fight; that both Burdette and Painter were aware of their actions, were capable of forming intentions, and of premeditation, and that O'Brien died as a result of the continued and repeated blows administered him by Burdette and Painter. There can be little doubt that both Burdette and Painter had, on the day of the homicide, drunk intoxicating liquors to some extent, but it seems clear also, and at least a jury was warranted in finding, that at the time of the homicide Burdette and Painter were capable of acting maliciously and with premeditation. If the evidence of the State is believed, which the jury had the right to do, the joint actions of Burdette and Painter were timely coordinated; they recognized persons with whom they were acquainted, talked intelligently, had no difficulty in staying on their feet, and handled themselves throughout the fight without any noticeable staggering, *80 even while repeatedly kicking O'Brien about the head.
The actions of the trial court complained of are included in the following propositions: In overruling the demurrer to the indictment and in denying the motion to quash the indictment; in refusing to grant Burdette's motion for a continuance; in refusing to grant a new trial because of after discovered evidence; in refusing to set aside the verdict and to grant Burdette a new trial because not supported by the law and the evidence; in giving certain instructions on behalf of the State, and in refusing to give certain instructions offered by Burdette; in permitting the jury to consider certain evidence offered by the State; in permitting the assistant prosecuting attorney to argue that robbery was a motive for the killing; and in that the punishment imposed upon Burdette constituted cruel and unusual punishment.
We think the indictment is in sufficient form. Nothing is pointed out by defendants as to why the demurrer thereto should have been sustained, or why the indictment should have been quashed, except it is shown that one of the grand jurors was not a resident of Kanawha County. Code, 62-9-3, provides that an indictment for murder shall be sufficient if it alleges, in effect, that the defendant, at a time designated, in a certain county, "feloniously, wilfully, maliciously, deliberately and unlawfully did slay, kill and murder one B.........., against the peace and dignity of the State." An indictment substantially following the form provided by the statute is sufficient. State v. McMillion, 104 W.Va. 1, 138 S.E. 732.
One of the qualifications of grand jurors set out in Code, 52-2-2, is that they "shall have been bona fide citizens of the State and county for at least one year immediately preceding the preparation of the list" of grand jurors prepared by the jury commissioners. Code, 52-2-12, provides that "No presentment or indictment shall be quashed or abated on account of the incompetency or disqualification of any one or more of the grand jurors who found the same." Under this section a question as to the incompetency or disqualification of a grand juror can not be heard for the purpose of having an indictment invalidated. State v. Austin, 93 W.Va. 704, 117 S.E. 607; State v. Driver, 88 W.Va. 479, 107 S.E. 189, 15 A.L.R. 917. Of course this rule would not apply where fraud or corruption is charged. State v. Carter, 49 W.Va. 709, 39 S.E. 611.
There is no merit in the contention of the defendant that a continuance should have been granted him by the trial court. The motion therefor was grounded upon the fact that Harold Teague, for whom Burdette had caused a subpoena to be issued, but not served, was absent at the time of the trial. We are of the opinion there was not a sufficient showing that the testimony of the witness was material, that it was not merely cumulative, or that it would probably be produced at a future trial. It clearly appears that the evidence of the witness would have been merely cumulative. Granting of continuances by trial courts are matters within the sound discretion of such courts. Here that discretion was not abused. See State v. Lucas, 129 W.Va. 324, 40 S.E.2d 817; State v. Whitecotten, 101 W.Va. 492, 133 S.E. 106; State v. Bridgeman, 88 W.Va. 231, 106 S.E. 708.
The motion for a new trial upon the ground of after discovered evidence was based primarily upon an affidavit of Frank A. Blum, Jr. It appears from this affidavit that Blum is a resident of Pennsylvania; that he was walking along Summers Street at the time of the fight and that he would testify to the effect that "between five and eight men were engaged in the fight" and that they seemed to be considerably intoxicated; that he saw O'Brien have an open knife during the course of the fight and heard Burdette say, "I know he has a knife"; that Burdette struck O'Brien a hard blow, knocking him to the sidewalk with great force, and that Burdette then ran in and kicked him; that Painter also ran in and kicked O'Brien twice, and that he is positive that "no woman * * * picked up O'Brien's head and held it in her lap * * *." *81 This evidence being merely contradictory and probably not sufficient to produce a different result at a new trial, it was not error for the trial court to refuse to grant a new trial based thereon. It is very significant that Blum did testify in the case of State v. Painter, supra, and that the verdict in that case was guilty of murder in the first degree without any recommendation. In State v. Beckner, 118 W.Va. 430, 190 S.E. 693, Point 1 of the syllabus, this Court held: "On a motion for a new trial on the ground of after-discovered evidence, any showing in support thereof must disclose, not only diligence to discover such evidence before trial, but that the same is calculated to produce, and would support, a different verdict from that returned by the jury."
See State v. Porter, 98 W.Va. 390, 127 S.E. 386; Edwards v. Keifer, 92 W.Va. 650, 115 S.E. 838; and Sisler v. Shaffer, 43 W.Va. 769, 28 S.E. 721.
The position of the defendant as to the insufficiency of the evidence to support the verdict of murder in the first degree is based primarily upon the contention that Burdette was so intoxicated that he was incapable of deliberation and premeditation immediately before or during the time of the fight. The duty of proving deliberation and premeditation, of course, is upon the State. State v. Williams, 98 W.Va. 458, 127 S.E. 320. Malice or premeditation need not exist for any great length of time before the homicide. It was held in State v. Porter, 98 W.Va. 390, 127 S.E. 386, Point 9, syllabus, that: "It is well settled that, if intent to take life is executed after deliberation and premeditation, though but for a moment or an instant, the crime is murder in the first degree."
Ordinarily malice can not be inferred from blows with the fist, but such an assault may be accompanied with such brutality and violence that malice and premeditation will be implied. In State v. Roush, 95 W.Va. 132, 120 S.E. 304, Point 6, syllabus, this Court held:
"A malicious intent to kill cannot be presumed from the striking of a full-grown person on the head with the bare fists by a person of small stature and mediocre strength, although death results, unless the assault is so vicious, continued, deadly, and barbaric, and under such circumstances, that malice can be implied."
There can be no doubt here that the jury was justified in concluding that the killing of O'Brien was done with malice, deliberation and premeditation. The assault was vicious, brutal and continued by both Burdette and Painter, even after O'Brien was helpless, as disclosed by the evidence of many witnesses, some of whom testified on behalf of the defendant, Burdette. The assault was not merely with the fists. After O'Brien was knocked down and unable to defend himself, Burdette said he would "* * * stomp his God damn brains out", and both Burdette and Painter did repeatedly stomp him, and after the police arrived Burdette said: "The God damned son-of-a-bitch got what was coming to him." In such circumstances the defendant must be presumed to have intended the immediate, direct and necessary consequences of his acts. State v. Roush, supra. In State v. Farley, 125 W.Va. 266, 23 S.E.2d 616, Point 1, syllabus, this Court held: "Deliberation and premeditation are elements of the offense of murder in the first degree, which may or may not be established by inference according to the circumstances of each particular case."
In McWhirt's Case, 3 Grat. 594, 595, 44 Va. 594, 595, 46 Am.Dec. 196, the defendant was indicted, with others, for the murder of Martin, who abused the son of McWhirt. The killing was by "a use only of fists and feet", and it was contended by the defendant that no intent to kill was shown, but that the purpose of the attack upon Martin was chastisement for the abuse of the son. The Court held that the fact "that chastisement, and not killing, was intended, will not reduce a homicide to manslaughter, where the manifest design was to do great bodily harm", and that the fact that the "killing was produced by the use only of the fists and feet does not reduce the offense below the rank of murder, when such use was excessive, cruel and outrageous in nature, and continuance." The Court, in the opinion, *82 used language very appropriate here. "It was strongly contended, that chastisement, and not death, of the deceased, was clearly intended. Malice aforethought may consist in the intention to do great bodily harm, as well as to kill; and whether the intention be the one or the other, and death happen, the law will not surrender its general presumption, that the homicide is murder. No one can review these transactions without seeing most clearly that great bodily harm at least was intended to be perpetrated upon the deceased. Much stress was also laid upon the circumstance, that the prisoner might have resorted to deadly weapons, which were at hand, if he had designed any fatal injury to the deceased; and that, instead of employing these, he had only availed himself of the weapons which nature had furnished him with. And it was moreover insisted, that no case had been found deciding the homicide to be murder, when, under such circumstances, the fatal attack had been made only with the fists, and the death of the party beaten was not immediately produced under the infliction of the violence; but followed some time afterwards. The fists may not, indeed, be regarded generally as a deadly weapon; but they become most deadly, by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless, unresisting man on the ground. And if to the injury they are capable of producing, when wielded by a strong man, you add all the accompanying injuries which the more powerful agency of stamping the party on the ground may inflict, there might be a strong ground to infer the intention, not merely to cause great bodily harm, but even death itself. Without dwelling particularly upon the circumstances, and the degree of the violence under which the deceased suffered, it can not be regarded otherwise than as excessive, cruel, greatly exceeding the widest boundaries of mere chastisement, outrageous in its nature, as well in the manner as the continuance of it, and beyond all provocation to the offense. And we may apply to it, with great propriety, the saying quoted above of Lord Holt, `that barbarity will often make malice.'" Other cases to the effect that malice and premeditation may be inferred are State v. Roush, supra; State v. Medley, 66 W.Va. 216, 66 S.E. 358; State v. Young, 50 W.Va. 96, 40 S.E. 334; State v. Douglass, 28 W.Va. 297; Carson v. Commonwealth, 188 Va. 398, 49 S.E.2d 704; Dawkins v. Commonwealth, 186 Va. 55, 41 S.E.2d 500; Commonwealth v. Lisowski, 274 Pa. 222, 117 A. 794; Maulding v. Commonwealth, 172 Ky. 370, 189 S.W. 251; People v. Denomme, 6 Cal.Unrep.Cas. 227, 56 P. 98. It seems clear, therefore, that in the circumstances of the instant case the question of malice was one for jury determination. State v. Saunders, 108 W.Va. 148, 150 S.E. 519; State v. Hedrick, 99 W.Va. 529, 130 S.E. 295; State v. Young, supra.
The jury was fully and clearly instructed as to the law relating to malice, premeditation and deliberation necessary to raise a homicide to murder in the first degree. In State v. Welch, 36 W.Va. 690, 15 S.E. 419, Point 7, syllabus, this Court held: "The question whether a particular homicide is murder in the first or second degree is one of fact for the jury. Where a jury has found the case to be one of murder in the first degree, as in other cases, the court should not disturb the verdict, unless the finding of murder in the first degree be plainly and manifestly contrary to or without sufficient evidence."
Burdette complains particularly of the action of the trial court in giving to the jury State's Instructions Nos. 4 and 5, which read as follows:

"State's Instruction No. 4
"The Court instructs the jury that, if you believe from the evidence in this case, beyond a reasonable doubt, Harry Atlee Burdette and Fred Painter, acting together, or the defendant Harry Atlee Burdette by himself, wilfully, maliciously, deliberately and premeditatedly killed the deceased, Edward O'Brien, you should find the defendant, Harry Atlee Burdette, guilty of murder in the first degree, although he may have been drinking intoxicating liquors before and at the time of the killing, unless you further believe from the evidence that at the time of the killing he was so grossly *83 intoxicated that he did not know he was doing wrong nor did not know what the consequence of his act might be."

"State's Instruction No. 5
"The Court instructs the jury that a person who is intoxicated may yet be capable of deliberation and premeditation; and if the jury believe from all the evidence in the case beyond a reasonable doubt that the defendant, Harry Atlee Burdette, acting alone or in concert with Fred Clifford Painter, willfully, maliciously, deliberately and premeditatedly killed the deceased, Edward C. O'Brien, you should find him guilty of murder in the first degree although he was intoxicated at the time of the killing."
Apparently the objection made to these instructions is that they interpose a defense of insanity where that defense is not at issue and thus confused or misled the jury. We do not understand defendant to contend that a person can not be guilty of murder in the first degree even though that person be intoxicated, if in fact the person be capable of wilful premeditation and deliberation. The law seems clearly to be that only where the defendant is intoxicated to such a degree as to be thereby rendered incapable of forming an intent to kill, or wilful premeditation and deliberation, will the degree of homicide be reduced from murder in the first degree, because of such intoxication. Applying this rule to the instant case, we can not see where the defendant could possibly have been prejudiced by the giving of these instructions. They appear most favorable to him. It is conceivable that he could have known that he was "doing wrong yet not have been able to form specific intent, or to wilfully premeditate and deliberate." Instruction No. 4 was given in practically the same form in State v. Corey, 114 W.Va. 118, 171 S.E. 114, except as to the wording relating to the insanity involved in the Corey case. In that case this Court held, Point 3, syllabus: "`A verdict of guilty in a criminal case will not be reversed here because of error committed by the trial court, unless that error is prejudicial to the accused.' State v. Rush, 108 W.Va. 254, 150 S.E. 740."
Under the evidence in the instant case the question whether Burdette was intoxicated to such a degree as to be incapable of forming an intent to kill or of wilful premeditation and deliberation was a question for the jury and, having been properly instructed by the court in relation thereto, this Court has no right to disturb their finding. The precise question involved here was properly presented to the jury by the giving of Defendant's Instruction No. 30, which reads: "The Court instructs the jury that though they may believe from the evidence in this case that the defendant Harry Burdette, killed the deceased without any provocation and through reckless wickedness of heart, but at the time he did the act, his condition from intoxication was such as to render him incapable of doing a willful, deliberate and premeditated act, they cannot find him guilty of murder in the first degree."
Burdette also assigns as error the action of the trial court in giving to the jury State's Instructions Nos. 1, 2, 3, 6 and 7. Instruction No. 1 told the jury that one of five verdicts could be returned, murder in the first degree, murder in the second degree, voluntary manslaughter, involuntary manslaughter, and not guilty, defined each, and informed the jury as to the punishment provided as to each of such crimes. No. 2 informed the jury as to the presumption of an unlawful homicide being murder in the second degree, the burden being upon the State to show it was murder in the first degree, and the burden being upon the defendant to show it to be without malice, and therefore only manslaughter, or that he acted lawfully. No. 3 simply informed the jury that the intention to kill need not exist in the mind of the accused for any particular length of time prior to the killing to constitute a wilful, deliberate and premeditated killing. No. 6 dealt with the right of an aggressor or assailant to rely upon the defense of self-defense, and No. 7 informed the jury as to the law governing the burden of proof where self-defense is relied upon as an excuse for the killing. Defendant's theory of self-defense was correctly stated to the jury in instructions offered by him. No *84 specific ground of objection is mentioned in the brief filed in behalf of Burdette as to any of these instructions and, after careful consideration, we find no prejudicial error in the giving of any of them.
Burdette also complains as to the action of the court in refusing to give to the jury his Instructions Nos. 1, 2, 3, 4, 17, 19, 21, 25, 26, 27, 31, 32, 33 and 35, but does not assign specific grounds showing the basis of his objections. No. 1 would have directed the jury to find the defendant not guilty and the giving thereof would not have been warranted. Nos. 2, 3 and 4 would have instructed the jury that the greatest offense for which Burdette could be convicted was less than Murder in the first degree, and the giving of any of them would have been clearly unwarranted under the evidence, as previously indicated. No. 17 dealt with reasonable doubt, was covered by other instructions, and as drawn was incorrect and misleading. No. 19 was amended by the court by inserting the words "after having heard the instructions of the court, and argument of counsel", thus requiring the jury to not only consider the evidence but to consider the instructions and arguments, before reaching a verdict. There was no error in so amending the instruction. The other instructions of defendant which were refused were fully covered by other instructions given, and we find no need for further discussion of them here.
The complaint of the defendant Burdette as to the admission of certain evidence over his objection relates to the introduction of a newspaper supposed to have been the one purchased by O'Brien. Burdette contends that the introduction of the paper tended "to prejudice the minds of the jury by reason of its gruesomeness unfairly against the defendant in this case." Shortly after the body of O'Brien was removed from the sidewalk Patrol Officer Smith placed three sheets of a newspaper found near there over the blood spot on the sidewalk, and a little later Policeman Johnson placed the remaining part of the paper over the three sheets. Later, Alice Cobb picked up the paper and kept it in her possession until it was delivered to a representative of the prosecuting attorney's office. She identified the paper at the time of the trial as the one which she picked up and as being dated July 31, 1950, and stated, in effect, that it was saturated with blood when it was picked up. We see no error in permitting the jury to have this evidence. The paper was sufficiently identified and could possibly have been of aid to the jury in determining the viciousness of the attack. True, it may have had considerable effect on the minds of the jury, but that is no reason why it should have been rejected. That objection may be said of almost any material evidence. See State v. McDonie, 89 W.Va. 185, 109 S.E. 710; State v. McKinney, 88 W.Va. 400, 106 S.E. 894; State v. Henry, 51 W.Va. 283, 41 S.E. 439; State v. Baker, 33 W.Va. 319, 10 S.E. 639.
Complaint is also made that the prosecuting attorney, in his opening statement to the jury, told them that the purpose of the defendant in making the attack was robbery, and that an assistant prosecuting attorney made a statement to the same effect in the closing argument. It will be remembered that there was evidence to the effect that Alice Cobb, a short time before the fight, requested O'Brien to bring her a drink of wine; that O'Brien had the taxi make a stop near 29 Clendenin Street, "a bootleg joint", and that a bottle was thrown, presumably by either Burdette or Painter, during the fight, and that the contents thereof smelled like alcohol. The State, however, did not prove that O'Brien purchased or ever had in his possession a bottle of wine, except possibly by inference which may be drawn from the above acts and from the further fact that it was proved that Painter had in his possession at the time of his arrest the pint of liquor last purchased by Burdette and himself. Presumably this was the evidence which was referred to by the prosecuting attorney. We think reference thereto could not have been prejudicial to the defendant, in view of all the evidence. There is no attempt to show in what manner the defendant could have been prejudiced thereby. Moreover, the alleged statements of the *85 prosecuting attorney and of the assistant prosecuting attorney were not made part of the record. As to this assignment of error, the defendant below relies upon State v. McLane, 126 W.Va. 219, 27 S.E.2d 604; State v. Hively, 103 W.Va. 237, 136 S.E. 862; and State v. Moose, 110 W.Va. 476, 158 S.E. 715. These cases, we think, have no application here.
The defendant Burdette further complains that the sentence imposed by the trial court is "a violation of Article III, Section 5 of the Constitution of West Virginia, and of the 8th amendment to the Constitution of the United States. The point is not argued in the brief of defendant. We assume that the position of defendant is that execution of the sentence of death by electrocution constitutes "cruel and unusual punishment" within the meaning of the constitutional provisions.
By Chapter 37 of the Acts of the Legislature of 1949, Section 3, Article 7, Chapter 62 of the Code of West Virginia was amended so that now "The sentence of death shall, in every case, be executed by electrocution of the convict until he is dead", except in certain instances not material here. The amendment became effective March 12, 1949. Prior to that time execution of the death sentence was required by statute to be "by hanging the convict by the neck until he is dead". Section 5 of Article III of the State Constitution, in so far as applicable, reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. * * *" The Eighth Amendment to the Federal Constitution is in precisely the same language.
It seems well settled that punishment of death by electricity does not constitute cruel or unusual punishment. It is common knowledge that the purpose and intent of the Legislature of West Virginia in enacting the amendment to Code, 62-7-3, was to provide a more humane and less cruel means for execution of death sentences. That the enactment of the amendment was within the power of the Legislature can not be doubted. In Ex parte Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519, a case involving a similar question, from the State of New York, it was held that execution of sentence of death by electricity is within the sphere of the legislative power of the State. This case was cited in State v. Woodward, 68 W.Va. 66, 69 S.E. 385, 30 L.R.A.,N.S., 1004. See McElvaine v. Brush, 142 U.S. 155, 12 S.Ct. 156, 35 L.Ed. 971. The Constitution of Virginia of 1776 contains a provision to the same effect as the above quoted provision of Section 5, Article III of the West Virginia State Constitution, and the Supreme Court of Appeals of Virginia, in Hart v. Commonwealth, 131 Va. 726, at page 743, 109 S.E. 582, at page 587, stated; "The punishment of death by electrocution (which is the present mode of inflicting the death penalty in Virginia), as is well settled, cannot in itself be regarded as a cruel or unusual mode of punishment."
We have carefully examined the record of this case and are of the opinion that the defendant, Burdette, has had a fair and impartial trial. He has been ably represented by counsel in the courts below and in this Court, and a jury, the trial court and the circuit court, have found him to be guilty of murder in the first degree, without recommendation. Such conclusions can not be reached, of course, without much anxiety, concern and solicitude. Some consolation may be had, however, in the belief that a reasonably strong enforcement of criminal laws may save the lives and protect the rights and property of innocent persons.
We therefore affirm the judgments of the Circuit and Intermediate Courts of Kanawha County, and remand this case to the intermediate court for the purpose of fixing a date for carrying the judgment of that court into effect.
Affirmed.